UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SYMPHONY FABRICS CORPORATION, x          07-Civ.  6606 (GEL)
                                     :
            Plaintiff,               :
                                     :
      v.                             :          **DECLARATION OF DEFENDANT,**
                                     :          **DAVID S. KNAPEL IN SUPPORT OF**
DAVID S. KNAPEL AND TEXTILE          :          **DEFENDANTS' MOTION TO COMPEL**
IMPRESSIONS, INC.,                   :          **ARBITRATION AND TO DISMISS**
                                     :          **THE COMPLAINT, OR IN THE**
            Defendants.              :          **ALTERNATIVE, TO STAY ITS**
                                     :          **PROSECUTION PENDING**
                                     :          **ARBITRATION**
_____ x

      DAVID S. KNAPEL, declares under penalty of perjury that the following is true and correct:

      1.    I am named as an individual defendant in the within action, together with Textile Impressions, Inc., a Delaware Corporation ("TII"), an entity in which I am the sole shareholder, director and officer.

      2.    I make this Affidavit on behalf of both TII and me in support of our motion pursuant to *Fed.R.Civ.P.12(b)(6)* to compel arbitration and to dismiss the Complaint of the plaintiff, Symphony Fabrics Corporation ("Symphony"), or in the alternative, to stay its prosecution pending arbitration.  A true copy of the Complaint is attached hereto as *Exhibit 1*.

**BACKGROUND OF ACTION**

      3.    The genesis of the claims asserted by Symphony in the Complaint arise from and relate to that certain Asset Sale And Purchase Agreement ("Agreement") entered into as of

98-3449.04\KnapelAffidavit9-11-07

March 1, 2006 between TII, as seller, Symphony, as purchaser, and me. A true copy of the Agreement is attached hereto as *Exhibit 2*.

4.    In *Paragraph 8* of the Complaint, Symphony asserts, in part, that "[t]his action does not arise out of the Agreement, but rather from Knapel's employment by Symphony." For all of the reasons set forth below, and despite Symphony's attempt to mischaracterize the true nature of the action, in actuality, the entirety of the Complaint's allegations directly and inextricably pertain to various financial and accounting issues arising out of the Agreement.

5.    Specifically, this action revolves around a dispute or difference in arithmetic calculation regarding certain monetary adjustments, which under the terms of the Agreement, are, if at all, due to or owing from either TII or Symphony (collectively, the "Adjustments"). In sum, Symphony and TII each contend that under the applicable provisions of the Agreement, it (and not the other) is entitled to certain post-closing dollar "credits." Alternatively, Symphony and TII, as applicable, contest and dispute that it (as opposed to the other) are subject to charge under the Agreement with certain dollar "debits" or "offsets" in arriving at the final Adjustments quantification.

6.    Essentially, the Adjustments issue exists because over a multi-month period both preceding and following March 1, 2006 (*i.e.,* the "Effective Date" as said term is defined in *Section 1.4* of the Agreement), revenues generated from product sales were realized and expenses (both operating and otherwise) were incurred by Symphony and TII. It is the reconciliation of these items which "straddle" the several month period prior and subsequent to the Effective Date, and which of the parties is to receive or be charged, as applicable for the Adjustments which is at the heart of this action.

7.     Instead, however, of accurately depicting the ongoing controversy as one relating to the Adjustments, Symphony, without any basis in fact, alleges, among other things, that TII and I have converted its monies.  As explained hereinbelow, the monies TII and I are accused of converting are in fact, the very funds comprising the Adjustments.  The disposition and/or allocation of these funds between the parties represent issues directly and inextricably emanating from the Agreement.

8.     As more particularly detailed hereinbelow, the Adjustments are based upon certain specific provisions contained in the Agreement.  While TII and Symphony may, in the first instance, possibly disagree as to which of them is: (*i*) entitled to receive the revenue; and (*ii*) responsible for reimbursement, if any, for expenses paid by the other, the irrefutable fact remains that these arithmetic and computational differences (including their dollar quantification) unquestionably arise out of and/or relate exclusively to the Agreement.

9.     In *Paragraph 8* of the Complaint, Symphony alleges that this action does not arise out of the Agreement "but rather from Knapel's employment by Symphony."  (Complaint, ¶8). Curiously, Symphony fails to mention the fact that my "employment by Symphony" to oversee and manage its Pago Division, arose exclusively out of the Agreement.  Prior to the Effective Date (and, in fact, continuing thereafter for approximately five (5) months), I effectively remained an employee of TII and not Symphony.

10.    Although *Paragraph 9* of the Complaint states that "Knapel was employed by Symphony to run its Pago division," practically every factual allegation set forth in the Complaint directly implicates those revenue and expense items which are the subject of the Adjustments.  For example, Symphony alleges that I: (*i*) collected payments on merchandise (Complaint, ¶*12*); (*ii*) neglected to remit payments to Symphony (*id*.); (*iii*) deposited funds into

TII's bank account (*id*); (*iv*) deposited or directed customers to deposit funds into TII's bank account (*id.*, *¶13*); and (*v*) neglected to remit payments to Symphony from both cash and credit card receivables (*id.*, *¶14*). Each of these allegations relate to the monies which are the subject matter of the Adjustments.

11.     Furthermore, the Complaint completely (and conveniently) ignores the fact that at some future time, the Adjustments had to be resolved between TII and Symphony. This post-closing undertaking was something I was and remained at all times committed and willing to do. In fact, specific paragraphs in the Complaint implicitly concede that the monies TII and I are alleged to have converted are the very funds which are the subject of the Adjustments.

12.     *Paragraph 14* of the Complaint alleges that:

> "Knapel neglected to remit payments to Symphony from both cash and credit card receivables resulting in shortages on Symphony's General Ledger and overages in TI's [*i.e.*, TII] accounts."

13.     *Paragraph 18* of the Complaint alleges that:

> "These funds belonged to Symphony, not Knapel or TI [i.e., TII], and despite Symphony's demands, Knapel and TII have failed to repay these funds." [Emphasis Added]

14.     *Paragraph 23* of the Complaint alleges that:

> "Despite Symphony's requests, Knapel and TI [*i.e.*, TII] have failed to provide support showing they were entitled to these payments…." [Emphasis Added]

15.     The "cash and credit card receivables", "payments" and "funds" referred to in *Paragraphs 14* and *18* of the Complaint in fact, represent the same revenues which are subject

matter of the Adjustments.    Similarly, the "support" referenced therein at *Paragraph 23* represents the "back-up" or documentation for the Adjustments, which, in part, I had already given to Symphony while still in its employ.  Moreover, certain of the referenced "support" are in the form of computer records presently in Symphony's exclusive care, custody and control, and as to which I have been denied access by Symphony.

16.    Once the allegations in the Complaint are understood in the context of the Agreement and the Adjustments, it is apparent that, for the reasons set forth hereinbelow, the matter must be referred to arbitration in accordance with *Section 9.5* of the Agreement.

**SYMPHONY AND TII'S PRIOR BUSINESS RELATIONSHIP**
**AND THE FRAMEWORK OF THE AGREEMENT**

17.    At all times relevant hereto, including both before and after the Agreement's Effective Date, TII was engaged in the purchase and sale of fabrics and other textiles and materials used in the apparel and other related industries.

18.    Prior to the Effective Date, TII operated and conducted business under various tradenames and trademarks associated therewith, the most prominent of which for purposes hereof was the tradename "Pago Fabrics" ("Pago").

19.    Effectively, while still owned by TII, Pago operated as the functional equivalent of a stand-alone division within TII.  In my capacity prior to December 31, 2005 as a long term TII employee, and subsequent thereto, as its sole shareholder, director and officer, I oversaw and was responsible for all operational and financial aspects of Pago.

**(i) Parties' Past Business Relationship**

20.    By way of background, prior to the execution of the Agreement, TII and Symphony had an ongoing business relationship which had commenced sometime in or about

2003, at a point in time when I did not own TII. Rather, I was then a full time employee, serving in the capacity of Chief Financial Officer.

21.    In fact, it was at or about that time, that on TII's behalf, I met with and engaged in preliminary discussions with Symphony's President (and to the best of my knowledge, sole shareholder), Seymour D. Schneiderman ("Schneiderman") regarding a possible transaction whereby TII (backed by its then parent corporation – a Japanese conglomerate) would acquire either the assets and/or stock of Symphony. Although these discussions continued over a period of time, they eventually ended without any acquisition, sale or other business combination having been consummated.

22.    Notwithstanding the termination of these discussions concerning TII's potential acquisition of Symphony, as a result of my efforts, the two (2) companies nevertheless pursued certain limited business opportunities with one another. For example, TII, doing business through the Pago trade name, engaged in a joint venture with Symphony whereby Pago sold some of Symphony's products to Pago customers, with the profits being equally divided between Symphony and TII. Indeed, it was my understanding that over the approximate two (2) year period during which the foregoing arrangement was in effect, Symphony benefited through its receipt of more than $100,000.00, representing its share of the profits from this arrangement.

23.    Following my acquisition of TII from the Japanese at the end of December, 2005, I opened a dialogue with Schneiderman in or about the latter part of January 2006 concerning a possible transaction between TII and Symphony. This time however, the discussions revolved around a sale of TII's assets to Symphony which ultimately culminated in the transaction ("Transaction") embodied in and memorialized by the Agreement.

### (ii)  Transaction and Pertinent Agreement Provisions
### Relating to the Adjustments

24.     In broad terms, the Transaction, as effected by the Agreement, involved the sale by TII to Symphony of certain specific categories of TII's assets, properties and business identified and defined with particularity as "Assets" in *Section 1.1* of the Agreement.  Included among the Assets sold by TII to Symphony was all Pago inventory referenced in *Exhibit B* to the Agreement.

25.     Importantly, except for the Agreement's *Section 1.1* itemization of the Assets sold to Symphony, TII's remaining assets retained (*i.e.*, excluded) from this sale were identified as "Excluded Assets" in *Section 1.6* of the Agreement.

26.     In order for this Court to appreciate and understand how and why this dispute between the parties centers upon the calculation, determination and quantification of the Adjustments generated by and resulting from the Transaction, as opposed to any alleged inappropriate and/or otherwise unlawful actions on my or TII's part, reference and discussion with respect to certain provisions of the Agreement are required.

27.     While it was inevitable that there would be certain Adjustments arising from the Transaction which would need to be resolved on a post-closing basis, neither TII nor I anticipated, prior to our entry into the Agreement, that the transition or overlap period between moving over TII's business operations to Symphony would, as a direct result of Symphony's complete failure and/or inattention to the need to make this transition between the two (2) entities as "seamless" as possible, end up taking an extended period of several months to accomplish.

28.     What Symphony so inaccurately characterizes as my "having embezzled approximately Four Hundred Forty-Five Thousand Dollars" from it (Complaint, ¶*1*), apparently

results from its own unilateral calculation of the net Adjustments figure to which it believes (albeit erroneously) itself to be entitled from TII resulting from the Transaction.

29.     Unfortunately, for an extended period of time while still employed by Symphony, I made repeated (albeit unsuccessful) attempts to meet face to face with Schneiderman and other Symphony representatives to provide him/them with my own analysis of the Adjustments and how I had arithmetically arrived at my rough estimate as to "net" dollar amount thereof, including the final balance due or owing, as applicable, between Symphony and TII.

30.     Regrettably, however, my calculation of the Adjustments was based on incomplete documentation then in my possession, because Symphony had retained and denied me access to additional information and documentation needed to maximize the accuracy of my computations.    Parenthetically, following the forced termination of my employment with Symphony, my attorneys tried unsuccessfully to acquire additional financial information from Symphony's attorneys so as to afford me the opportunity to thoroughly analyze and calculate a more exact Adjustments figure in absolute dollars for Symphony's consideration.

31.     Following the Effective Date and given the extreme pressures I was then placed under by Symphony to accomplish numerous business related tasks for its benefit, on as regular a basis as then possible, I had staff members analyze, compile, prepare and distribute to Symphony, monthly reconciliation reports (each such report being a "Reconciliation Report" and collectively the "Reconciliation Reports") containing a quantification of the then breakdown of the Adjustments items, including a category by category analysis of paid and/or unreimbursed expenses then being carried by either TII or Symphony, as applicable, as well as revenues received by or for the benefit or account of TII or Symphony, as applicable.

### (iii) TII's Assignment and Symphony's Assumption of
### Liabilities under the Agreement

32.    The total cash consideration paid by Symphony for the Assets was $500,000.00,

even though the Assets, and the Pago inventory in particular, has a fair market, going concern

value in excess of $2,000,000.00.    In addition to this cash component, Symphony agreed

pursuant to *Section 3.1* of the Agreement to assume and pay, perform and discharge all of certain

itemized and identified liabilities arising as of, on and after the Effective Date.    These items are

all identified in the Agreement as "Assumed Liabilities."

33.    *Section 3.1* of the Agreement provides as follows:

> "**3.1    Assignment And Assumption Of Liabilities.**    Subject to the
> terms and conditions of this Agreement, Seller hereby assigns, and Purchaser
> hereby assumes, and agrees to pay, perform and discharge all of Seller's
> obligations arising as of, on and after the Effective Date under the Contracts And
> Leases set forth on *Exhibit A*, and the other commitments set forth on *Exhibit E*
> annexed hereto and made an express part hereof (collectively, the "**Assumed
> Liabilities**"); *provided, however,* that Purchaser shall not be deemed to assume,
> pay, perform or discharge any obligation to pay a commission, finders' fee or
> similar fee for business procurement with respect to any of the Contracts And
> Leases set forth on *Exhibit A*, and the other commitments set forth on *Exhibit E*.
> Except as specifically set forth in this *Section 3.1* and in *Sections 5.3, 5.4, 5.5, 5.6*
> and *9.14*, no other debts, obligations, contracts, leases, commitments and
> liabilities of Seller are being assumed, or shall be paid, performed or discharged
> by Purchaser pursuant to this Agreement." [Emphasis in the Original]

### (iv) Disposition of and Accounting for
### Accounts Receivable under the Agreement

34.    As noted hereinabove, Symphony and TII were each operating their respective

businesses before, at, and after the Effective Date of the Agreement.    Although the Effective

Date as defined in *Section 1.4* of the Agreement was March 1, 2006, in actuality, the Agreement

was executed by the parties in or about late March or early April 2006.

35.    The Agreement recognized that TII was entitled to receive and retain all revenues to be realized resulting from its outstanding accounts receivable prior to the Effective Date, while Symphony was solely entitled to all new accounts receivable to be generated as and after the Effective Date.

36.    The accounting for and settlement of the many pre-and post-closing financial issues between Symphony and TII (*i.e.*, the Adjustments) not only envisioned, but necessitated an ongoing and continuing procedure whereby the revenue received on a post-Effective Date basis from the accounts receivable, as well incurred and/or unreimbursed expenses, would eventually have to be analyzed by and allocated between TII and Symphony.  In this specific regard, it is again noteworthy (as previously stated in *Paragraph 27* hereof) that at no time prior to the Agreement's execution did TII or I ever have any inkling or give any potential thought to the possibility that Symphony would in the cavalier, lax, inefficient and nothing less than the negligent manner in which Symphony chose to handle the post-acquisition integration of the two (2) companies' business operations.

37.    For example, it was clearly realized and anticipated by TII and Symphony that monies would be received by TII after the Effective Date resulting from product sales which had occurred both pre- and post-closing.  Clearly, these monies had to be earmarked, segregated and maintained in identifiable bank accounts, because eventually TII and Symphony would need to reconcile or "true up" between themselves as to which entity was entitled to which portions of these revenues.

38.    Moreover, the same inevitable reconciliation which applied to revenues generated equally pertained to and was required regarding various pre-and/or post-closing incurred and/or unreimbursed expenses items.

39.     The obvious need for the post-closing reconciliation between Symphony and TII's respective accounts concerning realized receivables is provided for in the Agreement.  For example, as more particularly discussed hereinafter, *Section 4.1(xv)* of the Agreement illustrates the relationship and interplay involved in the determination and quantification of the Adjustments as they pertain to accounts receivable.

40.     Both post-Effective Date (*i.e.*, post-March 1, 2006) and post-closing (*i.e.*, late March/early April 2006),  revenues were being received by TII in satisfaction of accounts receivable which had been generated from its ongoing business operations prior to the Effective Date.    Importantly, under *Section 1.6(xi)* of the Agreement, all such accounts receivable generated from TII's business prior to the Effective Date were deemed Excluded Assets and as such were to be exclusively retained by TII.

41.     Accordingly, in view of the ongoing receipt of revenues realized from TII's accounts receivable, the Agreement implicitly acknowledged that TI and Symphony would inevitably and eventually have to reconcile or "true-up" the revenues realized from product sales, as well as all incurred and/or unreimbursed expenses (*i.e.*, the Adjustments).

42.     Thus, *Exhibit E* to the Agreement entitled "Assumed Liabilities" references the "post-closing" collection of accounts receivable generated prior to the Effective Date, and provides as follows:

> **"Note:** Purchaser acknowledges its awareness that Seller remains solely responsible for the satisfaction (from both the Purchase Consideration <u>and its collection, on a post-closing basis, of all accounts receivable generated by Seller prior to the as of Effective Date</u>) of the following liabilities (collectively, the **"Outstanding Liabilities"**) [Emphasis in the Original]

43.    In accordance with its obligations under *Exhibit E* to the Agreement, TII collected and has maintained the revenues realized from the accounts receivable fully intact. I can only conclude from the unsupportable claims asserted against TII and me by Symphony in the Complaint that it has either through error, oversight or misinformation, erroneously concluded that I "embezzled its" monies when in fact, nothing could be further from the truth.

44.    Quite to the contrary, I repeatedly attempted to meet with Schneiderman and/or any other designated Symphony representative to resolve any and all pre-and post-closing issues. Symphony, however, has at all times steadfastly refused to meet. Rather, Symphony, without providing this Court with the benefit of any context whatsoever, and effectively overlooking the Agreement's existence, in its entirety, deliberately ignores the indisputable fact that a whole host of financial issues relating to the Transaction still remain to be resolved between the parties. In doing so, Symphony's approach has been to make malicious, scurrilous and scandalous allegations against my good name.

45.    The Agreement also provides in its *Section 4.1(x)(v)* thereof, that TII subsequent to the Effective Date and subject to conditions specified therein, would relocate its business to another facility. As further confirmation, however, that the Agreement contemplated an eventual revenues and expenses reconciliation, *Section 4.1(x)(v),* in pertinent part, reiterates that the profits generated from accounts receivable were subject to Symphony's obligation to continue paying the Assumed Liabilities, thereby establishing a "netting" process or mechanism pursuant to which revenues would be offset against incurred and/or unreimbursed expenses.

46.    That is, contemplated by and implicit in the foregoing is the eventual "offsetting" of revenue received versus incurred and/or unreimbursed expenses through the application of various "credits" and "debits." In fact, that is the very arithmetic methodology I employed in the

submission of the Reconciliation Reports to Symphony - all which I unsuccessfully attempted to review with Schneiderman and/or a designated Symphony representative.  For whatever reason, Symphony either rebuffed and/or otherwise chose to ignore my overtures.

47.     *Section 4.1(x)(v)* of the Agreement provides, in relevant part, as follows:

**"(xv)   Sale Of Real Property And Liquidation Of Seller's Business.** Subsequent to the as of Effective Date of this Agreement, Seller agrees that it will: (i) in good faith, expeditiously continue its efforts to market the Real Property, at its fair market value, for sale as soon as practicable on either an outright basis to a *bona fide* third party purchaser, or pursuant to a sale/leaseback transaction.    Either prior to or on a contemporaneous basis with the consummation of such sale, Seller shall find a rental facility to house its present business operations, unless the sale of the Real Property includes a sale/leaseback component, in which event the rental facility shall be a portion of the Real Property.  Purchaser shall be required to approve any such rental facility other than the Real Property.  The costs associated with any such relocation of Seller's business shall be at Seller's expense, *while all profits with respect to all accounts receivable generated as and after the Effective Date shall inure to the benefit of and shall belong exclusively to Purchaser, subject only to Purchaser's continuing obligation to satisfy the: (i) Assumed Liabilities in accordance with Section 5.5; and (ii) Rent And Related Real Property And Business Expenses in accordance with Section 5.6....*" [Emphasis Added]

### (v)   Arbitration Provision

48.     In order to resolve any future disputes or controversies arising out of or relating to the Agreement, TII, Symphony and I agreed in *Section 9.5* thereof to arbitrate, as opposed to litigate any and all of same, including similarly arbitrating any dispute or controversy arising out of any document or instrument delivered pursuant to or in connection with the Agreement.

49.     *Section 9.5* of the Agreement provides in its entirety as follows:

"**9.5      Arbitration.   *Any dispute or controversy arising out of or relating to this Agreement, any document or instrument delivered pursuant to, in connection with, or simultaneously with this Agreement, or any breach of this Agreement or any such document or instrument shall be settled by arbitration*** to be held in the State of New Jersey with such proceeding venued in the County of Bergen in accordance with the rules then in effect of the American Arbitration Association or any successor thereto.  The arbitrator may grant

injunctions or other relief in such dispute or controversy. The decision at [sic; of] the arbitrator shall be final, conclusive, and binding on the Parties. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the Parties irrevocably consent to the jurisdiction of the New Jersey State or Federal courts for this purpose. The losing Party in such arbitration shall pay all the costs and expenses of such arbitration proceeding, and all the reasonable attorneys' fees and expenses of the other Party." [Emphasis Added]

50.     The terms and conditions of *Section 9.5* of the Agreement were the subject of extended and considerable discussions and negotiation between Symphony and TII's attorneys. In fact, this language was only finally agreed upon after multiple drafts of and revisions to this provision had been circulated and commented upon between counsel. As a negotiated and integral provision of the Agreement, I viewed its incorporation therein as part of the consideration I had bargained for and which, for many reasons, deemed invaluable in my ultimate determination to enter into the Agreement and consummate the Transaction.

51.     It is respectfully submitted that the dispute between TII and Symphony regarding the Adjustments, among other issues arising out of or relating to the Agreement, is squarely and entirely subject to *Section 9.5* thereof.  Indeed, each of the Reconciliation Reports given to Symphony on a post-closing basis reflect the various credits and debits due to or owing from either or both Symphony or TII to the other clearly constitute pursuant to *Section 9.5*, a "document ... delivered pursuant to [and/or] in connection with the Agreement ... ."  After all, in accordance with *Section 9.5*, how much money Symphony and/or TII is ultimately either entitled to receive or is obligated to pay the other, if any, as a result of the Adjustments, squarely constitute a "dispute or controversy arising out of or relating to this Agreement."

## KNAPEL'S ANTICIPATED EMPLOYMENT BY
## AND ROLE AT SYMPHONY FOLLOWING THE TRANSACTION

52.    As set forth hereinabove, Symphony, acting through Schneiderman and its other representatives and agents in connection with the negotiations relating to the Agreement prior not only to the Effective Date but to the document's actual execution, and also on a continuing basis thereafter, made material representations, statements, assurances and promises ("collectively, "Representations") to me regarding the senior management position I was to have, as well as the job responsibilities and duties and overall long term future role I was to play at Symphony following the Transaction's completion.  In executing the Agreement, and agreeing to complete the Transaction, and as is evidenced not only by my willingness to work for Symphony on a long-term, post-closing basis, but by my actually having done so, I reasonably and in good faith relied upon the Representations, all as it now has turned out, to my ultimate damage and detriment, as well reputational and financial harm.

53.    Despite my reliance upon the Representations, Symphony neither adhered to nor honored same.  For instance, among other things, my post-closing job duties and responsibilities were far different than I had been led to believe they would be, and as they had been represented to be by Symphony and Schneiderman.  Ultimately, as a result of Symphony's refusal and/or failure to live up to the Representations, it exposed and subjected me, virtually throughout the entirety of my post-closing affiliation with it, to enormous pressures.  These pressures eventually led to my being harassed (in the face of threatened and certain termination) into a "voluntary" (albeit on a forced and coerced basis) resignation of my position with it in December 2006.

54.    Even though Schneiderman and I had agreed, prior to both the execution of the Agreement and the closing, that I would be employed by Symphony, in fact, following the

closing, I actually continued for a significant period thereafter to be employed by and paid through TII (with my salary being reimbursed by Symphony).  I only became a paid employee on Symphony's payroll as of August 1, 2006 … some five (5) months after the Effective Date.

55.    The issues relating to my termination from Symphony, including the damages suffered as a result of what have amount to the materially misleading, false and fraudulent Representations and Symphony's breach of same, are issues which I presently intend to assert in an arbitration proceeding under *Section 9.5* of the Agreement.  This is so, because both the inducement of my employment relationship with Symphony as consideration for my entering into the Agreement, as well as the circumstances surrounding the termination of said employment relationship are grounded in and directly result from the Agreement, and accordingly, under *Section 9.5* thereof, constitute a "dispute or controversy arising out of or relating to this Agreement …."

### KNAPEL'S UNSUCCESSFUL EFFORTS AND HIS INABILITY TO RESOLVE THE ADJUSTMENTS WITH SYMPHONY

56.    At all times relevant hereto and especially following the actual closing of the Transaction in late March/early April 2006, I contemplated and expected that various control, accounting and financial mechanisms and procedures (collectively, the "Post-Closing Procedures") would be established and put into place by Symphony's financial/accounting department and its personnel, so as to both facilitate and expedite the orderly transition of Pago into Symphony, where it would be known as the "Pago Division" of Symphony, as well as the merger of accounts, *etc.*, thereby streamlining both the management and going forward operations of the business.

57.    Set forth hereinbelow are some of the actions I either personally undertook and/or directed to be taken in order to ensure that Symphony was kept fully apprised and informed of incoming revenues and incurred and/or unreimbursed expenses – all of which comprise components of the Adjustments. I reasonably expected and believed that my actions would significantly advance an orderly resolution of the Adjustments.

58.    The implementation of the anticipated Post-Closing Procedures was critical because the transition of Pago into a division of Symphony was not going to be a seamless process, as each of TII and Symphony continued to operate as ongoing entities on a post-closing basis.

59.    Accordingly, I had expected that as soon as possible, Symphony's financial/accounting department would, as part of the Post-Closing Procedures, establish the requisite new bank accounts wherein monies resulting from Pago product sales (and irrespective of whether those revenues had been received in the form of cash, credit card receipts and/or advances by Pago's factor, CIT) would be deposited, segregated and maintained separately, until such time as the Adjustments were calculated with finality, and the associated reconciliation and "truing up" process between TII and Symphony had been completed, or at the very least had commenced.

60.    Despite my expectations, and the obvious and unquestioned need for Symphony to promptly establish and implement the Post-Closing Procedures so as to ensure an accurate reconciliation of the many pre-and post-closing financial issues relating to the Transaction, it wholly, completely and for lack of a better word, miserably failed to do so. For example, and by way of illustration only and not by way of limitation, Symphony did not establish the requisite new bank accounts or a credit card system which could and should have been used to receive,

segregate and maintain revenues received and/or to pay expenses, (including the Assumed Liabilities and unreimbursed expenses). In fact, the only account established by Symphony was a new CIT "factor" account through which accounts receivable were processed and monies received. This one action taken by Symphony was, however, necessitated entirely because both it and TII each used CIT as their factor in connection with processing of accounts receivable prior to the closing.

61.    The upshot of Symphony's failure to establish and implement the Post-Closing Procedures was, among other things that certain of Pago's expenses necessarily had to be "run" or paid through TII's own bank accounts. Clearly, payment of these expenses by TII does not represent unlawful "conversion" of Symphony's monies either by me or TII, but rather, such payments represent transactions necessitated by Symphony's very own actions (or more appropriately, inactions) in failing to expeditiously establish and implement the Post-Closing Procedures. These failures and/or inadequacies on Symphony's part necessitated that each such transaction would ultimately have to be "netted out" between the parties through the Adjustments as part of the reconciliation process.

62.    Moreover, as a direct result of Symphony's failure to open necessary bank accounts and a credit card system and implement the Post-Closing Procedures, there inevitability was a period of time during which post-Effective Date revenues generated from product sales, as well as accounts receivable allocable to Symphony under the Agreement were necessarily combined with TII's revenues. Again, these were only a temporary or "stop gap" measure taken of necessity by TII in the absence of implementation of the Post-Closing Procedures. Simply stated, there was no other practical or viable alternative available given Symphony's neglect and delay.

62.     Precisely because Symphony failed to do so, in an effort to effectuate the Adjustments, I asked Symphony's Chief Financial Officer, Mark Sherman ("Sherman"), to set up various bank accounts so as to expedite the reconciliation process.  Doing so would have assisted in ensuring that accurate financial records and accounts would be readily available and examinable whenever Schneiderman and/or Sherman, or for that matter, any other Symphony representative to quantify and resolve the Adjustments eventually deigned to meet with me.

63.     Unfortunately, my request to Sherman that the Post-Closing Procedures (including but not limited to the establishment of the bank accounts and a credit card system) be promptly implemented went completely unheeded.  Unfortunately, and although I had wanted to, I could not open the bank accounts or a credit card system for Symphony because I was neither authorized nor directed to do so by Schneiderman, Sherman or any other Symphony representative.  Nevertheless, had I had the authority to do so, these most elemental and basic of steps would most assuredly have been immediately taken following the closing.

64.     Notwithstanding that Symphony, by its failure to timely establish and implement the Post-Closing Procedures unnecessarily frustrated and complicated the orderly transition resulting from the Transaction, and indefinitely delayed the anticipated Adjustments, I still, nevertheless, kept Symphony informed as best as I could as to the status of the monies received on a post-closing basis by TII.

65.     In my effort to accurately account to Symphony during those pre-and post-closing months, I directed the preparation of the Reconciliation Reports which were regularly provided to Symphony's financial/accounting department on a more or less monthly basis during the initial months following the Effective Date.

66.    A representative true copy of one of the Reconciliation Reports is attached hereto as *Exhibit 3.*  Essentially, without burdening the Court with a detailed explanation thereof, this document reflects, among other things, expenses which Symphony had assumed as its obligation to pay under *Section 3.1* of the Agreement, as well as "offsets" from credit card and/or other payments to TII from customers made on account of past product sales to them (*i.e.*, offsetting revenues).

67.    As noted hereinabove, in connection with the foregoing use of credit card accounts, TII's credit card account system was used because Symphony had no such system in place following the closing.  Consequently, because the Pago Division of Symphony was supposed to be operated on a post-closing basis as a functioning and going concern, TII was, in effect, forced to use its own existing credit card system and its associated accounts to receive and recognize these incoming revenues.  Importantly, not only was Symphony fully aware that I had no choice but to use TII's credit card system, but critically, I actually had been instructed by Symphony to continue to use same in the absence of any similar or comparable Symphony system.

68.    Additionally, the Reconciliation Reports also reflect certain accounting entries concerning various shipping accounts and expense items associated therewith because, once again, Symphony had failed, in anticipation of the closing of the Transaction (and certainly following the consummation thereof), to make provision for same as part of the Post-Closing Procedures.  Accordingly, in the absence of such accounts, Symphony, in lieu thereof, used TII's shipping accounts.   The resultant expenses would, therefore, eventually also have to be reimbursed to TII by Symphony as part of the Adjustments.

69.     In sum, the Post-Closing Procedures (including, but not limited to bank accounts, credit card system, *etc.*) were not timely established by Symphony until approximately two (2) to three (3) months following the closing.  As noted hereinabove, Symphony's financial/accounting department, except for setting up a factoring account with CIT, took limited, if any, affirmative actions to facilitate the financial and accounting "mechanics" necessary so as to assure a smooth transition on a post-closing basis, and concomitantly, far fewer items in need of adjustments as part of the Adjustments.

70.     Although the Post-Closing Procedures were not timely implemented, Schneiderman, Sherman and Symphony's outside accountants all realized and recognized that reconciliation of the Adjustments was required in order to finalize all pre-and post-closing aspects of the Transaction.  Consequently, it was agreed among Schneiderman, Sherman and me that sometime during the latter part of 2006 and certainly in no event later than year's end, we would meet to both "true-up" and "settle-up" all then outstanding issues regarding the Transaction, including the Adjustments.

71.     Despite the parties' realization that it was essential to meet in order to address the Adjustments, we never did.  Moreover, notwithstanding my repeatedly asking Schneiderman when we were going to meet, I never received from him a definitive date certain to do so. Among the obvious reasons why I wanted to meet with Schneiderman or his designee, was that I was concerned that factor payments applicable to the several month period preceding the Effective Date  (which under the Agreement were for the sole benefit and account of TII), had been diverted from TII and deposited into a Symphony account.

72.     At all relevant times hereto, I was ready and willing to meet with Schneiderman, Sherman and/or any other Symphony representative for purposes of resolving the Adjustments,

notwithstanding the fact that following the forced termination of my employment with Symphony in December 2006, Symphony remained in exclusive care, custody and control of certain information and documentation, including my own computer which stored information needed, in part, to effectuate an accurate Adjustments reconciliation.

73.    It was not until I received a letter dated May 2, 2007 ("May 2[nd] Letter) from Symphony's General Counsel, a true copy of which is attached hereto as *Exhibit 4*, that Symphony expressed any interest in meeting with me regarding the Adjustments.  In fact, following my receipt of the May 2[nd]  Letter, I authorized my attorneys to communicate with Symphony's attorneys and request certain financial documentation, records and information from it directly bearing upon the Adjustments, so that following my review of same, we could informatively meet with Symphony's representatives.

74.    Although Symphony's attorneys received my attorneys' written request, they declined to provide the sought after documentation and information, and accordingly, no meeting ever was held.  Instead, Symphony filed the Complaint.

75.    Despite the absence of any meeting, I categorically deny that TII or I committed any "knowing and purposeful theft of funds by submitting false sales receipts, and falsifying books and records" (Complaint, ¶1) and/or any of the other wrongful conduct alleged in the Complaint.

76.    Moreover, in light of the fact that Symphony has acted in such an unconscionable manner and fashion *vis* a *vis* its relationship with me on a post-closing basis, I have sustained significant and substantial damages.  Had I known how Symphony generally and Schneiderman, in particular intended (notwithstanding the Representations) to treat me on a post-closing basis, I would have never allowed the Transaction to be consummated.  As a direct and proximate result,

among other things, of its conduct, actions and/or inactions, the damages I have sustained (and with respect to which I will be seeking to be awarded actual, consequential and punitive damages) and the Transaction related relief I will be requesting in the arbitration proceeding, will, in my estimation, far exceed the Adjustments, regardless of the amount thereof and the party entitled to the net amount of same.

77.    I respectfully request that the Court grant the within motion, as well as such other and further relief as it may deem to be reasonable, just and proper under the instant factual circumstances.

Dated: Montvale, New Jersey
September 18, 2007

DAVID S. KNAPEL