# EXHIBIT 2

# ASSET SALE AND PURCHASE AGREEMENT

THIS ASSET SALE AND PURCHASE AGREEMENT ("**Agreement**") is entered into and deemed effective as of the 1st day of March, 2006, by and between **TEXTILE IMPRESSIONS INC.**, a Delaware corporation ("**Seller**"), **DAVID S. KNAPEL**, an individual ("**Knapel**"), and **SYMPHONY FABRICS CORPORATION**, a New York corporation ("**Purchaser**"). Seller, Knapel and Purchaser are hereinafter each sometimes referred to as a "**Party**" and collectively, as the "**Parties**."

## WITNESSETH:

WHEREAS, Purchaser desires to acquire, and Seller desires to sell, transfer and assign to Purchaser, certain assets and liabilities of Seller, and a portion of Seller's business and goodwill as a going concern, all on the terms and conditions set forth in this Agreement; and

WHEREAS, Knapel is the sole shareholder of Seller;

NOW, THEREFORE, in consideration of the premises, and of the respective representations and warranties herein set forth, and of the covenants and agreements herein contained, the Parties hereby agree: (i) that the foregoing recitals are incorporated by this reference as if set forth at length in the body of this Agreement; and (ii) as follows:

## ARTICLE ONE

## DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1   "**Assets**" shall mean all right, title and interest of Seller in and to the following specific categories of assets, properties, and business of Seller:

(a)   The Contracts And Leases (said term being defined in *Section 1.3*);

(b)   The Inventory (said term being defined in *Section 1.7*);

(c)   The Equipment And Supplies (said term being defined in *Section 1.5*);

(d)   The trade names "Pago Fabrics," "Rosebar Textile," "Symphony Retail" and "Price Point Fabrics" (collectively, the "**Trade Names**");

(e)   The trademarks "Pago Fabrics," and "Village Square Cottons" (collectively, the "**Trademarks**"); and

(f)   All intellectual property rights, if any, in and to the Trade Names and Trademarks.

98-3449.03\AssetSalePurchAgt5-12-06clean

1.2  "**Assumed Liabilities**" shall have the meaning set forth in *Section 3.1*.

1.3  "**Contracts And Leases**" shall mean those contracts and/or maintenance/service agreements between Seller and third parties set forth on *Exhibit A* annexed hereto and made an express part hereof.

1.4  "**Effective Date**" shall mean March 1, 2006, which for all purposes under this Agreement is also the date upon which the Parties are deemed to have executed this Agreement and agreed to be fully bound by its terms.

1.5  "**Equipment And Supplies**" shall mean the equipment used in the business of Seller identified on *Exhibit C* annexed hereto and made an express part hereof.

1.6  "**Excluded Assets**" shall mean all assets of Seller not specifically enumerated as Assets, including without limitation, any right, title, interest or claim of Seller in, to or under any of the following assets:

(i)  cash, cash equivalents, securities and bank accounts of Seller;

(ii)  any refunds or claims for refunds of taxes (relating to tax periods, or portions thereof prior to the date hereof), or insurance premiums to which Seller might be entitled;

(iii)  the tax returns of Seller;

(iv)  all prepaid taxes of Seller;

(v)  any insurance policy or indemnity agreement of Seller, together with any claims under such policies or agreements;

(vi)  any claim of Seller against any affiliate or related entity, shareholder, director, officer or employee of Seller or of any affiliate or related entity of Seller;

(vii)  the contracts, leases, agreements, licenses and commitments of Seller other than those specifically enumerated as Assets;

(viii)  the Certificate of Incorporation and By-Laws, as amended, and the corporate minutes, stock books and corporate seal of Seller;

(ix)  the real property commonly known and identified as 120 Moonachie Avenue, Moonachie, Bergen County, New Jersey and more particularly designated as Lot No. 9, Block No. 62 on the Tax Maps of the Borough of Moonachie ("**Real Property**");

(x)  all items of personalty (i.e., fixtures) affixed to the Real Property; and

(xi) all accounts receivable generated from Seller's business prior to the as of Effective Date of this Agreement.

1.7 "**Inventory**" shall mean the fabric and other textiles and materials identified on *Exhibit B* annexed hereto and made an express part hereof.

1.8 "**Purchase Consideration**" shall mean the sale and purchase consideration as defined in *Section 2.3*.

1.9 "**Purchaser**" shall mean **SYMPHONY FABRICS CORPORATION**, a New York corporation.

1.10 "**Rent And Related Real Property And Business Expenses**" shall have the meaning set forth in *Section 5.6*.

1.11 "**Seller**" shall mean shall mean **TEXTILE IMPRESSIONS INC.**, a Delaware corporation.

## ARTICLE TWO

## SALE AND PURCHASE

Subject to the terms and conditions herein set forth:

2.1 **Sale And Purchase Of Assets**. As of the Effective Date, Seller has sold, assigned, conveyed and transferred to Purchaser, and Purchaser has purchased and acquired, all of Seller's right, title and interest in and to the Assets. Purchaser shall be entitled to receive, and Seller shall promptly remit to Purchaser, any and all monies, value, use and economic benefit accruing or deriving from the Assets as of and after the Effective Date.

2.2 **Instruments Of Assignment**. The sale, assignment, conveyance and transfer of the Assets to Purchaser, as herein provided, has been effected by Seller's execution and delivery to Purchaser as of the Effective Date of the Bill Of Sale, Assignment And Assumption Agreement ("Bill Of Sale") in the specimen form of *Exhibit D* annexed hereto and made an express part hereof, vesting in Purchaser all right, title and interest of Seller in and to the Assets.

2.3 **Purchase Consideration**. The purchase consideration for the Assets paid by Purchaser to Seller as of the Effective Date consists of: (i) the immediate tender by Purchaser to Seller, in currency of the United States of America, of the sum of **FIVE HUNDRED THOUSAND AND 00/100 ($500,000.00) DOLLARS**; and (ii) assumption by Purchaser of all obligations (financial and otherwise) to be satisfied in connection with the Assumed Liabilities (collectively, the "**Purchase Consideration**").

2.4 **Waiver**. The Parties hereby waive compliance with the provisions of any applicable bulk sales law.

## ARTICLE THREE

## ASSUMED LIABILITIES

3.1     **Assignment And Assumption Of Liabilities.**  Subject to the terms and conditions of this Agreement, Seller hereby assigns, and Purchaser hereby assumes, and agrees to pay, perform and discharge all of Seller's obligations arising as of, on and after the Effective Date under the Contracts And Leases set forth on *Exhibit A*, and the other commitments set forth on *Exhibit E* annexed hereto and made an express part hereof (collectively, the "**Assumed Liabilities**"); *provided, however,* that Purchaser shall not be deemed to assume, pay, perform or discharge any obligation to pay a commission, finders' fee or similar fee for business procurement with respect to any of the Contracts And Leases set forth on *Exhibit A*, and the other commitments set forth on *Exhibit E*. Except as specifically set forth in this *Section 3.1* and in *Sections 5.3, 5.4, 5.5, 5.6* and *9.14*, no other debts, obligations, contracts, leases, commitments and liabilities of Seller are being assumed, or shall be paid, performed or discharged by Purchaser pursuant to this Agreement.

## ARTICLE FOUR

## REPRESENTATIONS AND WARRANTIES OF SELLER

4.1     Seller represents and warrants to Purchaser as follows:

(i)     **Organization, Good Standing And Stock Ownership.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as, and in all places where, such properties are now owned, leased or operated, or such business is now conducted.

(ii)    **Authority.** Except for the consents contemplated by *Section 3.2*: (i) Seller has full authority and power to execute and to perform this Agreement in accordance with its terms; (ii) the transactions contemplated hereby will not result in a breach, violation or default or give rise to an event which, upon the occurrence of a specific event or the giving of notice or matter the passage of time, would result in a breach, violation or default of any of the terms or provisions of Seller's Certificate of Incorporation or By-Laws, as amended, or of any other indenture, agreement, judgment, decree or other instrument or restriction to which Seller is a party or by which Seller or any of the Assets may be bound or affected; (iii) this Agreement and all transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller and no further authorization or approval whether of the sole shareholder of Seller or governmental bodies, or otherwise, is necessary in order to enable Seller to enter into and perform the same; and (iv) this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms, subject to: (a) applicable bankruptcy, insolvency, reorganization, arrangement, fraudulent conveyance, moratorium or other similar laws relating to or affecting the rights of creditors generally or the collection of debtors' obligations generally,

heretofore or hereinafter enacted; and (b) the exercise of judicial discretion in accordance with general principles of equity (whether applied by a court of law or of equity).

(iii) **Title To Assets.** Except as set forth on *Exhibit F* annexed hereto and made an express part hereof, Seller has conveyed to Purchaser as of the Effective Date, good and marketable title to the Assets. None of the Assets or the use thereof: (i) is subject to any restrictions, mortgages, liens, pledges, charges, encumbrances, or rights or interests of any kind or nature whatsoever, other than the right of third parties under the Contracts And Leases and the other commitments set forth respectively on *Exhibits A and E;* (ii) to the best knowledge of Seller (without any independent investigation having been undertaken by it), contravenes any applicable law, ordinance or regulation or violates any restrictive covenant, the enforcement of which would result in any liability to the owner of the Assets or would in any respect interfere with or prevent the present and continued use of the Assets for the purposes for which they are now being used or would materially affect the value thereof; or (iii) to the best knowledge of Seller (without any independent investigation having been undertaken by it), infringes or encroaches on the property or other rights of another.

(iv) **Contracts And Leases.** The Contracts And Leases are in good standing, valid and effective in accordance with their respective terms, and all rents and payments due thereunder to date have been fully paid. As to the Contracts And Leases, in each case Seller is in peaceable possession, and the consummation of the transactions contemplated hereby, will not, assuming all required consents, if any, are received, constitute a breach, violation or default or give rise to an event which, after notice or the passage of time, would result in a breach, violation or default of any of the Contracts And Leases. No waiver, indulgence or postponement of the obligations of Seller under any of the Contracts And Leases has been granted, and there exists no event, occurrence, condition or act which, with the giving of notice, the lapse of time or the happening of any further event or condition, would become a default under any of the Contracts And Leases. Seller has not, nor to the best knowledge of Seller (without any independent investigation having been undertaken by it), has any lessor violated any of the terms or conditions under any of the Contracts And Leases in any material respect, and all of the covenants to be performed by Seller thereunder have been performed. True and complete copies of the Contracts And Leases have been made available to Purchaser for its inspection and the original executed copies, or if in any case an originally executed copy is not available, a true and correct copy thereof, has as of the Effective Date been delivered to Purchaser.

(v) **Condition Of Property.** All of the Assets are hereby sold by Seller to Purchaser as of the Effective Date in their present "AS IS" saleable condition. **SELLER MAKES NO EXPRESS OR IMPLIED WARRANTIES OF ANY KIND CONCERNING THE ASSETS AND ALL IMPLIED WARRANTIES, INCLUDING MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DESCRIPTION OR COMPLETENESS OF THE ASSETS ARE HEREBY EXCLUDED.**

(vi) **Patents, Trademarks, Etc.** Except for: (i) the Trade Marks and Trade Names; and (ii) those items specifically identified on *Exhibit G* annexed hereto and made a part hereof, there are no inventions, licenses, patents, patent applications, trademarks, registered

copyrights, trademark or copyright applications or registrations, pending or existing, owned by or registered in the name of Seller or in which Seller has any rights, and to the best knowledge of Seller (without any independent investigation having been undertaken by it), the present conduct of the business of Seller, including the use of the Trade Names and Trade Marks does not infringe upon or violate the patents, trademarks, trade names, copyrights or trade secrets of anyone, nor has Seller received any notice of any infringement thereof. Seller does not make any representation or warranty as to the right of Seller, Purchaser or any other person to the use of any of the Trade Names or Trade Marks which Seller believes are in the public domain.

(vii) **Governmental Approval**. To the best knowledge of Seller (without any independent investigation having been undertaken by it), Seller has all permits, licenses, orders and approvals of all federal, state, local or foreign governmental or regulatory bodies required for Seller to conduct the business as presently conducted, where the failure to have any such permit, license, order or approval would have a material adverse effect upon the business or Assets of Seller. All such permits, licenses, orders and approvals are in full force and effect and no suspension or cancellation of any of them is threatened, and none of such permits, licenses, orders or approvals will be affected by the consummation of the transactions contemplated by this Agreement. To the best knowledge of Seller (without any independent investigation having been undertaken it), no approval or authorization of or filing with any governmental authority on the part of Seller is required as a condition to the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

(viii) **Other Commitments**.

(a) Except for the: (i) Contracts And Leases set forth on *Exhibit A*; (ii) contracts or leases which may be terminated by Seller on not more than thirty (30) days' notice without premium or penalty; (iii) contracts for the purchase of less than **ONE THOUSAND AND 00/100 ($1,000.00) DOLLARS** of supplies or materials in any one instance, Seller is not a party to any executory oral or written (A) contract for employment of any officer or employee affecting or included in the Assets; (B) license agreement or dealer, distributor, manufacturer's representative, sales agency, advertising, property management or brokerage contracts affecting or included in the Assets; (C) profit sharing, bonus, deferred compensation, stock option or stock purchase plan, group life or hospitalization plan, severance pay, pension or retirement plan or agreement or any other similar contract plan or agreement affecting or included in the Assets; (D) agreement or arrangement for the sale of the Assets or the grant of a preferential right to purchase the Assets; (E) contract with any subcontractor affecting or included in the Assets; or (F) contract or agreement for the sale, lease or license of any portion or all of the Assets. Seller has not obligated and will not obligate itself to provide services for which it has already been paid under any Contracts And Leases which have, as of the Effective Date, been assigned to Purchaser hereunder.

(b) Notwithstanding Purchaser's assumption of liability with respect to the Assumed Liabilities, Purchaser shall not be deemed to assume, pay, perform or discharge any obligation to pay a commission, finders' fee or similar fee for business procurement with respect to any of the Contracts, Leases and other commitments. As of and after the Effective Date, Seller will not,

without the prior written consent of Purchaser, become a party to any contract, agreement or other instrument of the types mentioned in *sub-Section (a)* above with respect to the Assets. True and complete copies of the other commitments, if any, set forth on *Exhibit F* have been made available to Purchaser for its inspection and the original executed copies, or if in any case an originally executed copy is not available, a true and correct copy thereof, has as of the Effective Date been delivered to Purchaser.

(ix)    **Litigation.** Except as set forth on *Exhibit H* annexed hereto and made an express part hereof, there are no actions, suits, proceedings or investigations (including any purportedly on behalf of Seller) pending by or against or threatened against Seller with respect to or affecting any of the Assets, whether at law or in equity or before any arbitration panel or before or by any federal, state, municipal or other governmental department, commission, board, agency, court or instrumentality, domestic or foreign, and Seller is not operating under, subject to, in violation of or in default with respect to any unsatisfied or non-consensual judgment, order, writ, injunction, award or decree of any court, arbitration panel, or federal, state, municipal or other governmental department, commission, board, agency or instrumentality, domestic or foreign. Seller has no knowledge of any basis for any such action, suit, proceeding or investigation against Seller not now pending or listed on *Exhibit H*, the outcome of which would have an adverse effect or impact upon the Assets.

(x)    **Taxes.** All federal, state and local tax returns and reports required by law to be filed by Seller have been filed, and all taxes, assessments, fees, penalties, interest and other governmental charges shown to be due thereon have been paid or reserved against. Seller has withheld amounts for employees for all periods for which such withholding is due in full and complete compliance with the tax withholding provisions of federal, state and local laws, and proper and accurate returns with respect thereto have been filed and the amounts known thereon to be due and payable have been paid.

(xi)    **Benefit Plans.** Purchaser shall not have any liability or obligation with respect to any pension plan, profit-sharing plan, employee savings plan or other employees' benefit plan of Seller.

(xii)    **Disclosure.** No representation or warranty by Seller made in this Agreement and no statement made in any certificate, exhibit or schedule furnished in connection with the transactions herein contemplated omits to state any material fact necessary to make such representation, warranty or other statement not misleading.

(xiii)    **Solvency.** Seller is, at the time of execution and delivery of this Agreement, and shall be (as defined applying generally accepted accounting principles) at and immediately following the as of Effective Date hereof.

(xiv)    **Labor Matters.** Eight (8) of Seller's employees (collectively, the "**Union Workers**") are currently members of Local 2179 of the United Auto Workers Union ("**Union**"). Seller acknowledges that it is fully aware of the fact that certain of Purchaser's employees are also currently members of the Union. Notwithstanding the foregoing, Seller further

acknowledges that the Union Workers are not being offered employment by Purchaser on a post-closing basis pursuant to the terms of *Section 5.3*.

(xv) **Sale Of Real Property And Liquidation Of Seller's Business.** Subsequent to the as of Effective Date of this Agreement, Seller agrees that it will: (i) in good faith, expeditiously continue its efforts to market the Real Property, at its fair market value, for sale as soon as practicable on either an outright basis to a *bona fide* third party purchaser, or pursuant to a sale/leaseback transaction. Either prior to or on a contemporaneous basis with the consummation of such sale, Seller shall find a rental facility to house its present business operations, unless the sale of the Real Property includes a sale/leaseback component, in which event the rental facility shall be a portion of the Real Property. Purchaser shall be required to approve any such rental facility other than the Real Property. The costs associated with any such relocation of Seller's business shall be at Seller's expense, while all profits with respect to all accounts receivable generated as and after the Effective Date shall inure to the benefit of and shall belong exclusively to Purchaser, subject only to Purchaser's continuing obligation to satisfy the: (i) Assumed Liabilities in accordance with *Section 5.5*; and (ii) Rent And Related Real Property And Business Expenses in accordance with *Section 5.6*. Seller shall, following the disposition of the Real Property, proceed in ordinary and due course, to liquidate its business. The terms and provisions of this *Section 4.1(b)(xv)* are expressly intended to survive the Parties' execution and mutual exchange of this Agreement.

4.2 To the best of Knapel's knowledge and reasonable belief, all of the representations and warranties of Seller contained in *Section 4.1* are true and correct as of the Effective Date. For purposes hereof, the words "to the best of Knapel's knowledge and reasonable belief" shall be limited to the actual knowledge and information of Knapel without any independent investigation having been undertaken by him (as distinguished from, and to exclude, what is exclusively constructive knowledge or receipt of constructive notice), and does not include any information which Seller or its agents, counsel, directors, officers or employees, management companies or leasing agents, as a reasonably prudent person, should reasonably have known, and shall expressly exclude any state of facts or matters of which Purchaser has knowledge (actual, apparent or constructive) as of Closing.

## ARTICLE FIVE

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

5.1 **Organization And Good Standing.** Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of New York.

5.2 **Authority.** Purchaser has full authority and power to execute and to perform this Agreement in accordance with its terms. Subject to *Article 3*, the transactions contemplated hereby will not result in a breach, violation or default or give rise to an event which, upon the occurrence of a specific event or the giving of notice or after the passage of time, would result in

a breach, violation or default of any of the terms or provisions of Purchaser's Certificate of Incorporation or By-Laws, as amended or of any other indenture, agreement, judgment, decree or other instrument or restriction to which Purchaser is a party or by which Purchaser may be bound or affected. This Agreement and all transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Purchaser and, except as set forth in *Article 3*, no further authorization or approval, whether of the shareholders of Purchaser or governmental bodies, or otherwise, is necessary in order to enable Purchaser to enter into and perform the same. This Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and other laws affecting the enforceability of creditors' rights generally.

     5.3     **Personnel**. Purchaser agrees to offer employment to certain of Seller's personnel (including without limitation, David S. Knapel) on Purchaser's standard terms and conditions of employment. None of Seller's personnel, however, shall be or be deemed to be a third-party beneficiary of this Agreement, or have any rights by, through or under Seller or this Agreement. The terms and provisions of this *Section 5.3* are expressly intended to survive the Parties' execution and mutual exchange of this Agreement.

     5.4     **Seller's Union Workers**. Purchaser represents and warrants to Seller, in accordance with the terms of *Section 4.1(xvi)*, that while it will not offer employment on a post-closing basis to the Union Workers, it shall nonetheless tender on a continuing basis to Seller in the form of a management fee, such sums which in the aggregate shall equal all gross payroll and related benefits obligations due and owing from Seller to the Union Workers until such time as Seller completes the liquidation of its business and ceases its operations in the ordinary course.

     5.5     **Purchaser's Undertaking With Respect To Satisfaction Of All Assumed Liabilities**. Purchaser represents and warrants to Seller that as of and after the Effective Date, it shall, on a going forward basis, be deemed to have assumed, undertaken and agreed to pay, discharge or perform, as appropriate, all of the Assumed Liabilities. Purchaser hereby agrees to indemnify, hold and save Seller and Knapel harmless from and against any and all matters or claims (inclusive of attorneys' fees and costs) pertaining to and/or arising out of the Assumed Liabilities. The terms and provisions of this *Section 5.5* are expressly intended to survive the Parties' execution and mutual exchange of this Agreement.

     5.6     **Purchaser's Undertaking With Respect To Satisfaction Of All Rent And Related Real Property And Business Expenses**. Purchaser represents and warrants to Seller that as of and after the Effective Date, it shall, on a going forward basis, satisfy all shortfall(s) incurred by Seller between the actual gross rental income generated for Seller's benefit from any tenants of the Real Property (exclusive of Seller's own occupancy upon a portion of the Real Property which shall be deemed rent free) and Seller's actually incurred costs with respect thereto, including without limitation: (1) servicing the existing first mortgage indebtedness owed to Valley National Bank; (2) satisfying all accruing real estate tax obligations; (3) satisfying all accruing insurance premiums; (4) satisfying all utilities expenditures associated with Seller's continued ownership and operation of the Real Property and Seller's business; and (5) satisfying all net expenses incurred on a post-closing basis which relate either to the Real Property or

Seller's ongoing business operations (collectively, the "**Rent And Related Real Property And Business Expenses**"). Purchaser acknowledges that its obligation to satisfy the Rent And Related Real Property And Business Expenses shall continue until the last to occur of Seller's: (i) fully consummated sale of the Real Property; and (ii) final liquidation and cessation of its business operations. The terms and provisions of this *Section 5.6* are expressly intended to survive the Parties' execution and mutual exchange of this Agreement.

## ARTICLE SIX

### COVENANTS OF SELLER

Seller hereby represents and warrants to Purchaser:

6.1  **Examination Of Records**. Purchaser, its representatives, accountants and counsel have prior to the as of Effective Date, made such examinations and undertaken such investigations of Seller's business, properties, assets and affairs as Purchaser deemed necessary or desirable for all purposes relating to this Agreement.

## ARTICLE SEVEN

### BROKERAGE

7.1  **No Brokers**. Seller represents and warrants to Purchaser, and Purchaser represents and warrants to Seller and its shareholders, that all negotiations relative to this Agreement have been carried on by them directly with the other, without the intervention of any person.

## ARTICLE EIGHT

### INDEMNIFICATION BY SELLER

8.1  **Indemnity Against Claims**. Seller hereby agrees to indemnify and hold Purchaser harmless from and against the following:

(a)  Any and all damages or deficiencies resulting from any material misrepresentation, breach of any warranty, or non-fulfillment of any covenant, indemnity, undertaking or agreement on the part of Seller contained in this Agreement, or in any statement or certificate furnished or to be furnished to Purchaser pursuant hereto or in connection with the transactions contemplated hereby; and

(b)  Any and all liabilities or obligations of Seller not expressly assumed by Purchaser as provided in this Agreement; and

(c)  Any and all actions, suits, proceedings, demands, assessments or judgments, costs and expenses (including reasonable attorneys' fees) incident to any of the

foregoing, other than any action taken against Purchaser by any person under the provisions of the bulk sales law of any state.

## ARTICLE NINE

## GENERAL

9.1     **Nature And Survival Of Representations, Etc.**  Except for *Section 4(b)(xv)*, none of the representations, warranties and agreements made by Seller to Purchaser in this Agreement or pursuant hereto are deemed to survive Seller's delivery of the Bill of Sale to Purchaser on the Effective Date. Notwithstanding the foregoing, however, Seller's indemnity and defense obligations set forth in *Article Eight* shall continue in full force and effect through and including February 28, 2007, and Purchaser's obligations (financial and otherwise) set forth in *Article Two*, *Article Three*, *Sections 5.3*, *5.4*, *5.6* and *9.14* are expressly intended to survive the Parties' execution and mutual exchange of this Agreement, and shall continue in full force and effect until the last to occur of: (i) a fully consummated sale of the Real Property by Seller; and (ii) the final liquidation and cessation of Seller's business operations. Purchaser's obligations set forth in *Section 5.5* with respect to the Assumed Liabilities are expressly intended to survive, in perpetuity, the Parties' execution and mutual exchange of this Agreement.

9.2     **Books And Records.**  As of the Effective Date, Seller has delivered into Purchaser's custody all books and records of Seller or copies thereof, relating to the Assets, except for Seller's general ledger, tax returns, corporate minute and stock books.

9.3     **Notices.**  All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given:

    1.     when received if given in person;

    2.     on the date of transmission if sent by telecopy or other wire transmission (with transmission confirmed), provided that a copy of such transmission is posted on the date of transmission in the manner provided in clause (3) below; or

    3.     if sent by Federal Express, DHL, Airborne Express or other similar internationally recognized courier service providing receipt or confirmation of delivery, addressed as follows:

| If to Seller: | If to Purchaser: |
|---|---|
| Textile Impressions Inc.<br>120 Moonachie Avenue<br>Moonachie, New Jersey 07074<br>Attn: David S. Knapel, President<br>Telecopier: (201) 460-9115 | Symphony Fabrics Corporation<br>229 West 36th Street<br>New York, New York 10018<br>Attn: Seymour D. Schneiderman, President<br>Telecopier: (212) 736-0123 |
| With a copy to: | With a copy to: |
| Gruhin & Gruhin, P.A.<br>371 Franklin Avenue<br>Nutley, New Jersey 07110-0570<br>Attn: Stephen W. Gruhin, Esq.<br>Telecopier: (973) 667-8200 | Gerald Barandes, Esq.<br>27 Pine Street<br>New Canaan, Connecticut 06840<br>Telecopier: (203) 966-2253 |

or to such other address or to such other person as Purchaser or Seller shall have first designated by notice to the other parties.

9.4    **Entire Agreement**. This Agreement (inclusive of *Exhibits A* through *H*) contains the entire agreement between the Parties with respect to the transactions contemplated herein and there are no agreements, warranties or representations which are not set forth herein, and neither Party shall be entitled to any valuable consideration or payment except as expressly and specifically provided in this Agreement. All prior negotiations, agreements and understandings are superseded hereby. This Agreement may not be modified or amended except by an instrument in writing signed by or on behalf of the Parties.

9.5    **Arbitration**. Any dispute or controversy arising out of or relating to this Agreement, any document or instrument delivered pursuant to, in connection with, or simultaneously with this Agreement, or any breach of this Agreement or any such document or instrument shall be settled by arbitration to be held in the State of New Jersey with such proceeding venued in the County of Bergen in accordance with the rules then in effect of the American Arbitration Association or any successor thereto. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision at the arbitrator shall be final, conclusive, and binding on the Parties. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the Parties irrevocably consent to the jurisdiction of the New Jersey State or Federal courts for this purpose. The losing Party in such arbitration shall pay all the costs and expenses of such arbitration proceeding, and all the reasonable attorneys' fees and expenses of the other Party.

9.6    **Governing Law**. This Agreement shall, subject to the terms of *Section 9.5*, be governed by and construed and enforced in accordance with the internal laws of the State of New York, without giving effect to the conflict of laws rules of the State of New York.

9.7    **No Relinquishment**. Nothing contained in this Agreement shall constitute an assignment or relinquishment by Seller of any rights or claims that it may now or hereafter have against any person, firm, corporation or entity arising out of or in connection with acts or omissions occurring prior to the Effective Date.

9.8    **Confidentiality**. The Parties shall not issue any press release, make any public statement or otherwise disclose to third parties any information regarding the transactions contemplated by this Agreement, except as may be required of the Parties under applicable law or to their respective legal and accounting advisors, or except with the prior written consent of the other Party, which consent shall not be unreasonably withheld.

9.9    **Facsimile Signature/Counterparts**. Certain of the signatures affixed to this Agreement may be facsimile signatures. The Parties hereby acknowledge the genuineness of their respective signatures and warrant and represent that copies of this Agreement bearing their original signatures will either be hand delivered or forwarded by each of them to the other via first-class mail. This Agreement may be executed in any number of counterparts, all of which shall constitute one (1) and the same instrument, and any of the signatories hereto may execute this Agreement by signing one (1) or more counterparts.

9.10    **Waiver**. Any waiver of any term or condition of this Agreement, or any amendment or supplementation of this Agreement, shall be effective only if in writing. A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive a Party's rights hereunder at any time to enforce strict compliance thereafter with every term or condition of this Agreement.

9.11    **Section And Article Headings**. The Section and Article headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect any provision hereof.

9.12    **No Assignment**. This Agreement shall not be assignable otherwise than by operation of law by either Party without the prior written consent of the other Party, and any other purported assignment by a Party without the prior written consent of the other Party shall be void.

9.13    **Negotiated Agreement**. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against either Party.

9.14    **Purchaser's Closing And Post-Closing Deliverables**. As of the Effective Date, Purchaser has delivered the Purchase Consideration and the opinion of Purchaser's counsel, Gerald Barandes, Esq. to Seller. On or before April 15, 2006, Purchaser shall deliver to Seller: (i) a certified true copy of the resolutions of Purchaser's Board of Directors certified by its Secretary, authorizing the execution, delivery and performance of this Agreement and the other documents referred to herein to be executed by Purchaser and the consummation of the

transactions contemplated hereby and thereby; and (ii) such other certificates and documents as Seller may reasonably request.

9.15 <u>Seller's Post-Closing Deliverables</u>. On or before June 30, 2006, Seller shall deliver to Purchaser: (i) the Bill of Sale executed by Seller's president; (ii) a certified true copy of the resolutions of Seller's sole shareholder, authorizing the execution, delivery and performance of this Agreement and the other documents referred to herein to be executed by Seller and the consummation of the transactions contemplated hereby and thereby; and (iii) such other certificates and documents as Purchaser may reasonably request.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the day and year first above written.

TEXTILE IMPRESSIONS INC.

By: _____
DAVID S. KNAPEL, President

_____
DAVID S. KNAPEL, individually and as sole shareholder of Textile Impressions Inc.
(Solely As To Section 4.2)

SYMPHONY FABRICS CORPORATION

By: _____
SEYMOUR D. SCHNEIDERMAN, President

# EXHIBIT A

## CONTRACTS AND LEASES

[SEE, ATTACHED]

| Purchase Order Number | Invoice Date | Invoice Number | Invoice Amount | Payment Due Date |
|---|---|---|---|---|
| | 02/11/06 | 22506177 | $445.07 | 03/01/06 |



**Nature Of Service: Quarterly Billing**  0306-0506

**Current Charges:**

03/01/06 - 05/31/06
   Monitoring
      Amount: $407.22   Tax: $24.43              $431.65
   Recurring Service
      Amount: $12.66   Tax: $0.76              $13.42

**Total Balance Due:**                                $445.07

Did you know... Failure to include your invoice could cause a delay in processing your payment.

Don't Forget to Include the Following With Your Payment:
Customer Number
Invoice Number

MAR - 3 2006
52532

**Customer Number:**
01300 104415960
**Business/Account Name:**
TEXTILE IMPRESSIONS

**Service Address:**
120 Moonachie Avenue
Moonachie, NJ 07074

Billing Questions:  (800) 238-2455
Sales/Relocation:  (800) 238-7887
Monitoring/Service:(800) 238-2727
ADT Tax ID Number:  58-1814102
How to Read Your Bill:
   http://www.adt.com/invoiceinfo

2/17/06

Visit www.ADT.com for up-to-date security services information for your business.

To pay this invoice and/or future recurring invoices by credit card, follow the instructions on the back of this invoice.

**Late Fee Policy:** A late fee of 1.5% (or highest rate permitted by law, if less) per month will be assessed on the unpaid Total Balance Due when more than 30 days past due.

TEST YOUR ALARM SYSTEM MONTHLY TO CONFIRM YOUR SYSTEM IS OPERATIONAL

Page 1 of 1



**OCEAN COMPUTER MAINTENANCE**
1750 Brielle Ave.
Ocean, NJ 07712
(732)493-1900 Fax: (732)918-2613
www.oceancomputer.com

**CONTRACT INVOICE**

| | |
|---|---|
| Invoice # | 135643 |
| Date | 2/28/2006 |
| P.O. # | |
| Terms | Due Upon Receipt |
| Contract # | 7299 |
| Page # | 1 |

3/10/06

**Bill To Customer #:** 296900
Textile Impressions/Pago Fabrics
PO Box 357
Moonachie, NJ 07074

**Sold To Customer #:** 296900
Textile Impressions/Pago Fabrics
PO Box 357
Moonachie, NJ 07074

| Locn | Location Name | Location Address |
|---|---|---|
| 0 | Textile Impressions/Pago Fabrics | PO Box 357 Moonachie, NJ 07074 |

| Type | Item | Description | Equip Tag # | | Amount | Ext. Amount |
|---|---|---|---|---|---|---|
| STANDARD | 3180 200 | IBM Local Display 3180 200 | | | | |
| From 4/1/2006 To 6/30/2006 Serial # on above: EH032 | | | 1280 | access connie | 18.00 | 18.00 |
| STANDARD | 3180 200 | IBM Local Display 3180 200 | | | | |
| From 4/1/2006 To 6/30/2006 Serial # on above: G2337 | | | 1281 | Connie | 18.00 | 18.00 |
| STANDARD | 3180 200 | IBM Local Display 3180 200 | | | | |
| From 4/1/2006 To 6/30/2006 Serial # on above: N7279 | | | 1274 | Jane | 18.00 | 18.00 |
| STANDARD | 3180 200 | IBM Local Display 3180 200 | | | | |
| From 4/1/2006 To 6/30/2006 Serial # on above: CF076 | | | 1282 | Avish | 18.00 | 18.00 |
| STANDARD | 3180 200 | IBM Local Display 3180 200 | | | | |
| From 4/1/2006 To 6/30/2006 Serial # on above: 7455 | | | 1276 | access jane | 18.00 | 18.00 |
| STANDARD | 3180 200 | IBM Local Display 3180 200 | | | | |
| From 4/1/2006 To 6/30/2006 Serial # on above: F8343 | | | 1277 | Karen | 18.00 | 18.00 |
| STANDARD | 3180 200 | IBM Local Display 3180 200 | | | | |
| From 4/1/2006 To 6/30/2006 Serial # on above: N/A | | | 3992 | access catalina | 18.00 | 18.00 |

All Past Due Invoices Shall Be Charged Interest At The Rate Of 1.5% Per Month. In Addition, Seller Reserves The Right To Pursue Any And All Legal Action Available To Collect Past Due Charges. Buyer Shall Be Responsible For Any And All Costs Of Collection Including But Not Limited To Attorney Fees. This Agreement Shall Be Governed By The Laws Of New Jersey.