UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X
SYMPHONY FABRICS CORPORATION,           :
                                        :
              Plaintiff,                :
                                        :
       -against-                        :       Case No. 07-Civ.-6606 (GEL)
                                        :
DAVID S. KNAPEL and TEXTILE             :
IMPRESSIONS, INC.,                      :
                                        :
              Defendants.               :
------------------------------------------------------ X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO DISMISS THE COMPLAINT, OR IN THE ALTERNATIVE, TO STAY ITS PROSECUTION PENDING ARBITRATION

Edward H. Rosenthal (ER-8022)
Elizabeth H. Miller (EM-9404)
FRANKFURT KURNIT KLEIN & SELZ,
P.C.
488 Madison Ave.
New York, New York 10022
Tel.: 212-980-0120
Fax: 212-593-9175
erosenthal@fkks.com
emiller@fkks.com

Stephen W. Gruhin (SW-0526)
GRUHIN & GRUHIN, P.A.
60 Route 46 East
Fairfield, New Jersey 07004
Tel.: 973-227-9300
Fax: 973-227-3900
sgruhin@gruhinlaw.com

*Attorneys for David S. Knapel and
Textile Impressions, Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

    A.    The Agreement............................................................................................. 2

    B.    The Inevitable Need To Quantify The Adjustments Under The Agreement.......... 3

    C.    Knapel's Attempts To Resolve The Adjustments With Symphony As
        Anticipated And Required By The Agreement...................................................... 6

    D.    Knapel's Employment By Symphony Under The Agreement ............................... 9

    E.    The Arbitration Provision ................................................................................... 10

ARGUMENT.................................................................................................................... 11

POINT I - THE COURT SHOULD COMPEL ARBITRATION BECAUSE
SYMPHONY'S CLAIMS ARE SUBJECT TO A BINDING ARBITRATION
PROVISION ..................................................................................................................... 11

    A.    Defendants Have Satisfied The Applicable Standard As All Of
        Symphony's Claims Are Arbitrable Under The Agreement................................. 12

    B.    Section 9.5 Of The Agreement Is A Binding Arbitration Provision..................... 12

    C.    All Of Symphony's Claims Are Within The Scope Of Section 9.5 And
        Accordingly, Are Arbitrable ............................................................................... 14

    D.    All of Symphony's Claims Against Defendants Are Arbitrable Under the
        Agreement as a Matter Of Law............................................................................ 16

POINT II - SYMPHONY'S ACTION SHOULD BE DISMISSED OR, IN THE
ALTERNATIVE, STAYED PENDING ARBITRATION ............................................. 17

CONCLUSION................................................................................................................. 18

FKKS: 332720.v1

## TABLE OF AUTHORITIES

Page

## CASES

*Bird v. Shearson Lehman/Am. Express, Inc.*,
    926 F.2d 116 (2d Cir. 1991).................................................................................................11

*Chambers v. Time Warner, Inc.*,
    282 F.3d, 147 (2d Cir. 2002)..................................................................................................1

*Creative Sec. Corp. v. Bear Stearns & Co.*,
    671 F. Supp. 961 (S.D.N.Y. 1987), *aff'd mem.*, 847 F.2d 834 (2d Cir. 1988)...................12

*Dean Witter Reynolds Inc. v. Byrd*,
    470 U.S. 213 (1985)..........................................................................................................11, 17

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*,
    815 F.2d 840 (2d Cir. 1987).................................................................................................12

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
    387 F.3d 163 (2d Cir. 2004)............................................................................................15, 16

*Ljutovic v. 530 East 86th St., Inc.*,
    No. 05 Civ. 9846 (GEL), 2006 WL. 2524077 (S.D.N.Y. Aug. 31, 2006)...........................1

*Louis Dreyfus Negoce  S.A. v. Blystad Shipping & Trading Inc.*,
    252 F.3d 218 (2d Cir. 2001).................................................................................................16

*McMahan Sec. Co. L.P. v. Forum Capital Markets L.P.*,
    35 F.3d 82 (2d Cir. 1994).....................................................................................................15

*Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)...........................................................................................................12, 15

*Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Younger Bros., Inc.*,
    No. 00 Civ. 3277 (GEL), 2001 WL. 669042 (S.D.N.Y. June 13, 2001) ............................15

*Oldroyd v. Elmira Sav. Bank, FSB*,
    134 F.3d 72 (2d Cir. 1998)...................................................................................................16

*Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info.*,
    369 F.3d 645 (2d Cir. 2004).................................................................................................16

*Raiola v. Union Bank of Switzerland, LLC*,
    47 F. Supp. 2d 499 (S.D.N.Y. 1999)...................................................................................17

*Rand v. J.C. Bradford & Co.*,
    No. 98 Civ. 4906 (DLC), 1998 WL. 872421 (S.D.N.Y. Dec. 15, 1998)...........................17

*S.A. Mineracao Da Trindade-Samitri v. Utah Int'l Inc.*,
    745 F.2d 190 (2d Cir. 1984)............................................................................................15

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
    No. 07 Civ. 930 (GEL), 2007 WL. 1187870 (S.D.N.Y. Apr. 23, 2007) ..........................12

*Vera v. Saks & Co.*,
    335 F.3d 109 (2d Cir. 2003).............................................................................................16

*Williams v. Deutsche Bank Sec., Inc.*,
    No. 04 Civ. 7588 (GEL), 2005 WL. 1414435 (S.D.N.Y. June 13, 2005) ..........................1

*WorldCrisa Corp. v. Armstrong*,
    129 F.3d 71 (2d Cir. 1997)...............................................................................................17

## FEDERAL STATUTES

9 U.S.C. § 1 *et seq*..........................................................................................................................1

9 U.S.C. § 2....................................................................................................................................11

9 U.S.C. § 3....................................................................................................................................17

Fed. R. Civ. P. 12(b)(6)....................................................................................................................1

## PRELIMINARY STATEMENT

Defendants, David S. Knapel ("Knapel") and Textile Impressions, Inc. ("TII" and together with Knapel the "Defendants") respectfully submit this Memorandum of Law in support of their motion to compel arbitration and to dismiss the Complaint, or in the alternative, to stay its prosecution pending resolution of plaintiff Symphony Fabrics Corporation's ("Symphony") claims at arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. Defendants also submit the declaration of defendant Knapel ("Knapel Decl.") in further support of the motion.[1]

As set forth below, all of the claims asserted in Symphony's Complaint are clearly arbitrable under the broad governing arbitration provision contained in Section 9.5 of the Asset Sale and Purchase Agreement (the "Agreement") between TII, as Seller, and Symphony, as buyer and Knapel. Knapel Decl., Ex. 2. The dispute between the parties unquestionably falls within the broad scope of the provision which covers any "dispute or controversy arising out of or relating to this Agreement, [or] any document or instrument delivered pursuant to, [or] in connection with . . . this Agreement." *Id.* at 12. Accordingly, it is respectfully submitted that the Court should compel Symphony to submit all of its claims against Defendants to arbitration and dismiss the Complaint, or alternatively, stay the prosecution of the action pending the outcome of such arbitration.

---

[1] In deciding the motion brought pursuant to Fed. R. Civ. P. 12(b)(6), this Court has recognized that it is empowered to consider the underlying Asset Purchase and Sale Agreement between the parties discussed in paragraph 8 of the Complaint. True and correct copies of the Complaint and the Asset Sale and Purchase Agreement are attached as Exhibits 1 and 2 to the Knapel Decl. *See, e.g. Ljutovic v. 530 East 86th St., Inc.*, No. 05 Civ. 9846 (GEL), 2006 WL 2524077 at, *3 (S.D.N.Y. Aug. 31, 2006); *Williams v. Deutsche Bank Sec., Inc.*, No. 04 Civ. 7588 (GEL), 2005 WL 1414435, at *3 (S.D.N.Y. June 13, 2005); *Chambers v. Time Warner, Inc.*, 282 F.3d, 147, 154 (2d Cir. 2002).

## STATEMENT OF FACTS

This action arises out of Symphony's purchase from TII (the "Transaction") of certain specific categories of TII's assets, properties and business described and defined in the Agreement as "Assets." Knapel Decl., ¶ 24; Ex. 2 at 1-2. Included among the Assets being sold by TII to Symphony was the inventory of one of TII's businesses which was known as and transacted business under the tradename "Pago Fabrics" ("Pago"). Knapel Decl., ¶¶ 18, 24. Both Pago and Symphony were, at all times relevant hereto, engaged in similar businesses, namely the purchase and sale of fabrics and other textiles and materials used in the apparel and related industries. Knapel Decl., ¶ 17. In fact, TII and Symphony had a business relationship before the Transaction pursuant to which Symphony realized more than One Hundred Thousand Dollars ($100,000.00) in revenue. Knapel Decl., ¶¶ 20, 22. Additionally, Symphony's President and sole shareholder, Seymour D. Schneiderman ("Schneiderman") even met with Knapel to explore a possible acquisition by TII of Symphony's assets and/or stock but no such business combination ever occurred. Knapel Decl., ¶ 21.

### A.    The Agreement

Pursuant to § 1.4 of the Agreement, its effective date is March 1, 2006 (the "Effective Date"). This date was so designated by the parties notwithstanding the fact that the Agreement itself actually was executed by all parties thereto on or about March 31, 2006 or some time later in or about April 2006 when the Transaction was consummated and closed (the "Closing"). Knapel Decl., ¶ 34.

As a result of the Transaction, Pago was to become an operating division of Symphony known as the "Pago Division of Symphony." Knapel Decl., ¶ 56. Furthermore, as part of the Transaction and the Closing, Symphony agreed to employ Knapel in a senior management position. Knapel Decl., ¶ 52. In connection with Knapel's future employment by Symphony, it

made material representations, statements, assurances and promises relating thereto (collectively, "Representations") upon which Knapel had relied in entering the Agreement and agreeing to the Transaction. Knapel Decl., ¶ 52.

**B.**    **The Inevitable Need To Quantify The Adjustments Under The Agreement**

Both the Agreement's Effective Date and the date of the actual Closing are significant because prior to the Agreement's execution and at all times continuing thereafter, including post-Closing, both Symphony and Pago (while it was still part of TII and as a division of Symphony) were each operating ongoing businesses. Knapel Dec., ¶¶ 34, 58. Consequently, as part of their respective operations, revenue was going to be coming in as a result of product sales which had occurred prior to any of (i) the Agreement's execution date; (ii) the Effective Date; and (iii) the Closing. Knapel Decl., ¶¶ 34-37.

Additionally, as detailed in the Knapel Decl., expenses were also being incurred and paid by both Symphony and TII in these same time periods. Knapel Decl., ¶ 38. Accordingly, what was both anticipated by the parties and necessary from a practical standpoint, was a reconciliation process whereby certain accounting adjustments would be made to determine what amounts were either due to and/or owing from TII and/or Symphony under the Agreement (collectively, the "Adjustments"). Knapel Decl., ¶¶ 5-6. The culmination of this process would be a final calculation arrived at among the parties resulting in certain dollar "debits" or "offsets" being charged to either TII or Symphony. Knapel Decl., ¶ 5.

Essentially, the Adjustments issue exists because over a multi-month period both preceding and following the Effective Date revenue generated from product sales was realized and expenses (both operating and otherwise) were incurred by Symphony and TII. Knapel Decl., ¶ 6. It is the reconciliation of these items which "straddle" the several month period prior and subsequent to the Effective Date, and whether TII and/or Symphony should receive the foregoing

revenue and/or be charged with the expenses which is at the heart of this action.  *Id.*

In view of the fluidity of the ongoing business being conducted by Pago and TII, the Agreement recognized that TII was entitled to receive and retain all revenue to be realized which resulted from its outstanding accounts receivable prior to the Effective Date, while Symphony was solely entitled to all new accounts receivable to be generated as and after the Effective Date. Knapel Decl., ¶ 35.

The accounting for and settlement of the many pre and post-closing financial issues between Symphony and TII (*i.e.*, the Adjustments) envisioned and necessitated an ongoing and continuing procedure whereby the revenue received on a post-Effective Date basis from the accounts receivable, as well incurred and/or unreimbursed expenses, would eventually have to be analyzed by and allocated between TII and Symphony.  Knapel Decl., ¶ 36.  Parenthetically, however, at no time prior to the Agreement's execution did TII or Knapel ever have any inkling or give any thought to the possibility that Symphony would handle the post-acquisition integration of the two companies' business operations in the lax, inefficient and nothing less than negligent manner that it did.  *Id.*

For example, it was clearly anticipated by TII and Symphony that monies would be received by TII after the Effective Date for product sales which had occurred both pre and post-closing.  Knapel Decl., ¶ 37.  Clearly, these monies had to be earmarked, segregated and maintained in identifiable bank accounts, because eventually TII and Symphony would need to reconcile or "true up" between themselves as to which entity was entitled which portions of these revenues.  *Id.*  Moreover, the same inevitable reconciliation which applied to revenues generated equally pertained to and was required regarding various pre and/or post-closing incurred and/or unreimbursed expense items.  Knapel Decl., ¶ 38.

The obvious need for the post-closing reconciliation between Symphony and TII's

respective accounts concerning realized receivables is provided for in the Agreement. Knapel Decl., ¶ 39. For example, as more particularly discussed in the Knapel Decl., § 4.1(xv) of the Agreement illustrates the relationship and interplay involved in the determination and quantification of the Adjustments as they pertain to accounts receivable. Knapel Decl., ¶ 39; Ex. 2 at 8.

Both post-Effective Date (*i.e.*, March 1, 2006 and thereafter) and post-closing (*i.e.*, March 31, 2006 and thereafter), revenue was being received by TII in satisfaction of accounts receivable generated from its ongoing business operations prior to the Effective Date. Knapel Decl., ¶ 40. Importantly, under Section 1.6(xi) of the Agreement, accounts receivable generated from TII's business prior to the Effective Date were deemed Excluded Assets and as such were to be retained by TII. Knapel Decl., ¶ 40; Ex. 2 at 3.

Accordingly, in view of the ongoing receipt of revenues realized from TII's accounts receivable, the Agreement implicitly acknowledged that TII and Symphony would inevitably and eventually have to reconcile, or "true-up" the revenues realized from product sales, as well as all incurred and/or unreimbursed expenses (*i.e.*, the Adjustments). Knapel Decl., ¶ 41.

Thus, Exhibit E to the Agreement entitled "Assumed Liabilities" references the "post-closing" collection of accounts receivable generated prior to the Effective Date and provides as follows:

> **"Note:** Purchaser acknowledges its awareness that Seller remains solely responsible for the satisfaction (from both the Purchase Consideration *and its collection, on a post-closing basis, of all accounts receivable generated by Seller prior to the as of Effective Date*) of the following liabilities (collectively, the **"Outstanding Liabilities"**)." (Emphasis in the Original).

Knapel Decl., Ex. 2 at Ex. E.

In accordance with its obligations under Exhibit E to the Agreement, TII collected and has maintained the revenues realized from the accounts receivable fully intact. Knapel Decl., ¶

43. The Agreement also provides in § 4.1(x)(v) that TII, subsequent to the Effective Date and subject to conditions specified therein, would relocate its business to another facility. Knapel Decl., Ex. 2. As further confirmation that the Agreement contemplated an eventual revenues and expenses reconciliation, § 4.1(x)(v), in pertinent part, reiterates that the profits generated from accounts receivable were subject to Symphony's obligation to continue paying the Assumed Liabilities, thereby establishing a "netting" process or mechanism pursuant to which revenues would be offset against incurred and/or unreimbursed expenses. Knapel Decl., ¶ 45; Ex. 2 at 8. That is, contemplated by and implicit in the foregoing is the eventual "offsetting" of revenue received versus incurred and/or unreimbursed expenses through the application of various "credits" and "debits." Knapel Decl., ¶ 46. In fact, that is the very arithmetic methodology which Knapel used in preparing his various reports submitted to Symphony for its consideration in connection with the quantification of the Adjustments. *Id.*

**C.    Knapel's Attempts To Resolve The Adjustments With Symphony
As Anticipated And Required By The Agreement**

At all times relevant hereto and especially following the actual closing of the Transaction in late March/early April 2006, Knapel contemplated and expected that various control, accounting and financial mechanisms and procedures (collectively, the "Post-Closing Procedures") would be established and put into place by Symphony's financial/accounting department and its personnel, so as to both facilitate and expedite the orderly transition of Pago into Symphony, as well as the merger of accounts, etc., thereby streamlining both the management and going forward operations of the business. Knapel Decl., ¶ 56.

The implementation of the anticipated Post-Closing Procedures was critical because the transition of Pago into a division of Symphony was not going to be a seamless process as each continued to operate as ongoing entities on a post-closing basis. Knapel Decl., ¶ 58.

Accordingly, Knapel had expected that as soon as possible, Symphony's financial/accounting department would, as part of the Post-Closing Procedures, establish and open the requisite new bank accounts wherein monies resulting from Pago product sales (and irrespective of whether those revenues had been received in the form of cash, credit card receipts and/or advances by Pago's factor, CIT) would be deposited, segregated and maintained separately, until such time as the Adjustments were calculated with finality, and the associated reconciliation and "truing up" process between TII and Symphony had been completed, or at the very least had commenced. Knapel Decl., ¶ 59.

Despite Knapel's expectations, and the obvious and unquestioned need for Symphony to promptly establish and implement the Post-Closing Procedures so as to ensure an accurate reconciliation of the many pre and post-closing financial issues relating to the Transaction, it completely failed to do so. Knapel Decl., ¶ 60. For example, and by way of illustration only, Symphony did not establish the requisite new bank accounts or a credit card system which could and should have been used to receive, segregate and maintain revenues received and/or to pay expenses, (including the Assumed Liabilities and unreimbursed expenses). *Id.*

The upshot of Symphony's failure to establish and implement Post-Closing Procedures was, among other things, that certain of Pago's expenses necessarily had to be "run" or be paid through TII's own bank accounts. Knapel Decl., ¶ 61. Clearly, payment of these expenses by TII was not any unlawful "conversion" of Symphony's monies by Knapel or TII, but rather, such payments represent transactions necessitated by Symphony's very own actions and/or inaction in failing to expeditiously establish and implement the Post-Closing Procedures. These failures and/or inadequacies on Symphony's part necessitated that each such transaction would ultimately have to be "netted out" between the parties through the Adjustments as part of the reconciliation process. Knapel Decl., ¶ 61.

In sum, the Post-Closing Procedures (including, but not limited to bank accounts, and a credit card system, *etc.*) were not timely established by Symphony until approximately two to three months following the Closing.  Knapel Decl., ¶ 69.  As noted, Symphony's financial/accounting department, except for setting up a factoring account with CIT, took limited, if any, affirmative actions to facilitate the financial and accounting "mechanics" necessary so as to assure a smooth transition on a post-closing basis.  In fact, Symphony's failure to attend to these matters made the post-closing transition far more complicated than necessary. *Id.*

Not only did Symphony fail to establish and implement the Post-Closing Procedures, it went a step further in impeding and utterly frustrating the discussion and resolution of the Adjustments by failing to meet with Knapel despite his repeated requests for Symphony to do so. Knapel Decl., ¶¶ 46, 62-63.  Compounding the situation was the fact that Knapel had not been authorized or even directed by Symphony's representatives to open up the bank accounts or a credit card for Symphony, all of which were needed.  Knapel Decl., ¶ 63.

In his ongoing efforts to resolve the Adjustments and in anticipation of meeting with Schneiderman and/or other Symphony representatives, Knapel directed staff members to analyze, prepare and distribute to Symphony, monthly reconciliation reports (each such report being a "Reconciliation Report" and collectively the "Reconciliation Reports") containing a quantification of the then breakdown of the Adjustment items, including a category by category analysis of paid and/or unreimbursed expenses then being carried by either of TII and/or Symphony, as applicable, as well as revenues received by or for the benefit or account of TII or Symphony, as applicable.  Knapel Decl., ¶ 31.

In short, Knapel's efforts to accurately account to Symphony during the pre and post-closing months encompassed directing the preparation of the Reconciliation Reports which were

regularly provided to Symphony's financial/accounting department on a more or less monthly basis during the initial months following the Effective Date. Knapel Decl., ¶ 65. Such reports, reflected, among other things, expenses which Symphony had assumed as its obligation to pay under § 3.1 of the Agreement as "Assumed Liabilities" (as said terms more particularly are defined therein) as well as "offsets" from credit card and/or other payments to TII from customers made on account of past product sales to them (*i.e.*, offsetting revenue). Knapel Decl., ¶ 66.

**D.    Knapel's Employment By Symphony Under The Agreement**

As noted hereinabove, as part of the Agreement, Knapel was to be employed post-closing by Symphony. In executing the Agreement and agreeing to the Transaction, and as evidenced by Knapel's willingness to work for Symphony on a long-term, post-closing basis, he reasonably and in good faith relied upon certain material representations, statements, assurances and promises made by Symphony and Schneiderman (collectively, "Representations") regarding the senior management position, job responsibilities and duties and overall future role which he would assume post-closing. Knapel Decl., ¶ 52.

Unfortunately, and as an independent basis for compelling arbitration (and wholly independent of Symphony's exclusively arbitrable claims) Symphony failed to honor their Representations to Knapel's detriment. Knapel Decl., ¶ 53. For instance, among other things, Knapel's post-closing job duties and responsibilities were far different than he had been led to believe they would be and as had been represented to be by Symphony and Schneiderman. Knapel Decl., ¶ 53. Ultimately, as a result of Symphony's refusal and/or failure to live up to the Representations, Knapel was exposed and subjected, virtually throughout the entirety of his post-closing affiliation with it, to enormous pressures. Eventually, Knapel was harassed and, in the face of threatened and certain termination, forced to "voluntarily" resign (entirely under duress)

from his position with Symphony in December 2006. Knapel Decl., ¶ 53.

Even though Symphony and Knapel had agreed prior to both the execution of the Agreement and the Closing that Knapel would be employed by Symphony, he was actually employed by and paid through TII (with his salary being reimbursed by Symphony) after Closing. Knapel Decl., ¶ 54. Indeed, Knapel only became a paid Symphony employee and on its payroll as of August 1, 2006 - some five months after the Effective Date. *Id.* Accordingly, Knapel's termination from Symphony, including the damages which he has suffered from the materially misleading, false and fraudulent Representations of Symphony and Schneiderman, are issues which are arbitrable under § 9.5 of the Agreement. This is so, because both the inducement of Knapel's employment relationship with Symphony as consideration for his entering into the Agreement, as well as the circumstances surrounding the termination of his employment are grounded in and directly result from the Agreement. As such, this dispute constitutes under § 9.5 a "dispute or controversy arising out of or relating to this Agreement . . . ." Knapel Decl., ¶ 55. That is, the Agreement itself was induced and is tainted by fraud, as is Knapel's short-lived employment by Symphony.

E.    **The Arbitration Provision**

In order to resolve any future dispute or controversy arising out of or relating to the Agreement, TII, Symphony and Knapel agreed in § 9.5 thereof to arbitrate, as opposed to litigate, any dispute or controversy arising out of any document or instrument delivered pursuant to or in connection with the Agreement. Knapel Decl., ¶48.

§ 9.5 of the Agreement provides in its entirety as follows:

"**9.5    Arbitration.** *Any dispute or controversy arising out of or relating to this Agreement, any document or instrument delivered pursuant to, in connection with, or simultaneously with this Agreement, or any breach of this Agreement or any such document or instrument shall be settled by arbitration* to be held in the State of New Jersey with such proceeding venued in the County of

Bergen in accordance with the rules then in effect of the American Arbitration Association or any successor thereto. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision at [sic; of] the arbitrator shall be final, conclusive, and binding on the Parties.  Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the Parties irrevocably consent to the jurisdiction of the New Jersey State or Federal courts for this purpose. The losing Party in such arbitration shall pay all the costs and expenses of such arbitration proceeding, and all the reasonable attorneys' fees and expenses of the other Party." (Emphasis added).  Knapel Decl., Ex. 2 at 12.

The terms and conditions of § 9.5 of the Agreement were the subject of extended and considerable discussions and negotiation between Symphony and TII's attorneys.  Knapel Decl., ¶ 50.  In fact, the language of § 9.5 was only finally agreed upon after multiple drafts and revisions of this provision had been circulated and commented upon between counsel.  *Id.*  As a negotiated and integral provision of the Agreement, it was part of the consideration Knapel had bargained for and which, for many reasons, he deemed invaluable in his agreeing to the Agreement and the Transaction.  *Id.*

## ARGUMENT

## POINT I

### THE COURT SHOULD COMPEL ARBITRATION BECAUSE SYMPHONY'S CLAIMS ARE SUBJECT TO A BINDING ARBITRATION PROVISION

The Court should compel Symphony to arbitrate its claims against the Defendants pursuant to the arbitration clause contained in § 9.5 of the Agreement.  The Federal Arbitration Act ("FAA") was designed to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219 (1985).  Accordingly, the FAA provides that a written agreement to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  This provision "is a congressional declaration of a liberal federal policy favoring arbitration agreements." *Bird v. Shearson Lehman/Am.*

*Express, Inc.*, 926 F.2d 116, 119 (2d Cir. 1991) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

**A.    Defendants Have Satisfied The Applicable Standard As All Of Symphony's Claims Are Arbitrable Under The Agreement**

In considering a motion to compel arbitration in the Second Circuit, district courts utilize the following four-pronged inquiry: (1) whether there is an agreement to arbitrate; (2) the scope of that arbitration agreement; (3) whether the federal statutory claims, if any, were intended by Congress to be non-arbitrable; and (4) if only some of the claims are subject to arbitration, whether to stay the remainder of the proceedings pending arbitration. *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir. 1987); *Creative Sec. Corp. v. Bear Stearns & Co.*, 671 F. Supp. 961, 965 (S.D.N.Y. 1987), *aff'd mem.*, 847 F.2d 834 (2d Cir. 1988). This Court has characterized the arbitrability of a dispute as entailing two issues, namely, "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of the arbitration agreement encompasses the claims at issue." *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, No. 07 Civ. 930 (GEL), 2007 WL 1187870 at *3 (S.D.N.Y. Apr. 23, 2007) (citation omitted). As seen hereafter, each of the prongs of the foregoing test are easily met here, and accordingly, Symphony should be required to abide by the Agreement and arbitrate all of its claims against Defendants.

**B.    Section 9.5 Of The Agreement Is A Binding Arbitration Provision**

All of Symphony's claims directly arise out of and relate to the Agreement. The Complaint conveniently glosses over the important, indisputable and controlling fact that the "Symphony monies" which Knapel is alleged to have: (i) converted (Count I); (ii) enriched himself by; (Count II); and (iii) embezzled and failed to remit to Symphony in derogation of his fiduciary duties (Count III) are what constitute the subject matter of the Adjustments.

Perhaps nowhere is Symphony's Complaint more misleading than in paragraph 8 of the

Complaint. There Symphony alleges that this action does not arise out of the Agreement "but rather from Knapel's employment by Symphony." Knapel Decl., ¶ 8. Overlooked is the fact that Knapel's "employment by Symphony" to oversee and manage its Pago Division, as more particularly set forth in his affidavit, arose exclusively out of the Agreement. Knapel Decl., ¶ 9. Indeed, prior to the Effective Date (and continuing thereafter for approximately five months), Knapel effectively remained an employee of TII and not Symphony. *Id.*

Although paragraph 9 of the Complaint states that "Knapel was employed by Symphony to run its Pago division," practically every factual allegation set forth in the Complaint directly implicates those revenues and expense items which are the subject of the Adjustments. For example Knapel's alleged: (i) collection of payments on merchandise (Knapel Decl. Ex. 1, ¶ 12); (ii) neglecting to remit payments to Symphony (*id.*); (iii) depositing funds into TII's bank account (*id.*); (iv) depositing or directing customers to deposit funds into TII's bank account (*id.*, ¶ 13); and (v) neglecting to remit payments to Symphony from both cash and credit card receivables (*id.*, ¶ 14), each relate to the monies which are the subject matter of the Adjustments. Knapel Decl., ¶ 10.

Moreover, specific paragraphs of the Complaint relate to the manner in which Knapel is alleged to have dealt with the funds which are the very subject of the Adjustment. The salient allegations of its paragraphs 14, 18 and 23, respectively, confirm this. *See* Knapel Decl., Ex. 1.

Paragraph 14 of the Complaint alleges that:

> "...Knapel neglected to remit payments to Symphony from both cash and credit card receivables resulting in shortages on Symphony's General Ledger and overages in TI's [*i.e.*, TII] accounts."

Further, paragraph 18 of the Complaint alleges that:

> "*These funds* belonged to Symphony, not Knapel or TI [*i.e.*, TII], and despite Symphony's demands, Knapel and TII have failed to repay these funds." (Emphasis added).

Finally, paragraph 23 of the Complaint alleges that:

> "Despite Symphony's requests, Knapel and TI [*i.e.*, TII] have failed to provide *support* showing they were entitled to these payments . . . ."  (Emphasis added).

The "cash and credit card receivables", "payments" and "funds" referred to in paragraphs 14 and 18 of the Complaint are, in fact, the same revenues which are the subject matter of the Adjustments.  Knapel Decl., ¶15.  Similarly, the "support" referenced in paragraph 23 represents the "back-up" or documentation for the Adjustments, which Knapel had already ensured were delivered to Symphony on a regular basis.  *Id.*

### C.    All Of Symphony's Claims Are Within The Scope Of Section 9.5 And Accordingly, Are Arbitrable

No doubt, Symphony, by its putative, pre-emptive and conclusionary nine word allegation that "[t]his action does not arise out of the Agreement" (Knapel Decl., Ex. 1, ¶ 8), sought to dispense with and shield the Court's scrutiny of those unfortunate and complicating elements and factors of "context" and factual "background."  Symphony would have this Court read the Complaint in a virtual hermetically sealed vacuum, devoid of any factual circumstances, including the fact that Knapel's very employment by Symphony resulted from the Agreement.  However, a "fleshing out" of the Complaint's background makes clear that this dispute must be submitted to arbitration.

As set forth above, the allegedly "false sales receipts" and Knapel's alleged "falsifying [of] books and records" pertains to the documentation of the Adjustments and the information and "sales receipts" he generated to memorialize receipt of monies from the accounts receivable and which provided to Symphony.  Thus, these are all documents "arising out of and relating to the Agreement," and therefore, constitute their own independent bases for arbitration under § 9.5 of the Agreement which requires arbitration of "any dispute or controversy arising out of or relating to this Agreement, any document or instrument delivered pursuant to, in connection

with, or simultaneously with this Agreement, or any breach of this Agreement or any such document or instrument shall be settled by arbitration . . . ."  Knapel Decl., Ex. 2, ¶ 9.5 (emphasis added).

Consideration of the second prong of the test - the scope of the arbitration agreement - further supports Defendants' position that all of Symphony's claims should be submitted to arbitration.  In light of the strong federal policy favoring arbitration, courts are required to "construe arbitration clauses as broadly as possible" and enforce arbitration agreements "unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute."  *McMahan Sec. Co. L.P. v. Forum Capital Mkts. L.P.*, 35 F.3d 82, 88 (2d Cir. 1994) (quoting *S.A. Mineracao Da Trindade-Samitri v. Utah Int'l Inc.*, 745 F.2d 190, 194-95 (2d Cir. 1984)).  Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  This Court itself also has acknowledged this deference to reading arbitration provisions broadly.  *Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Younger Bros., Inc.*, No. 00 Civ. 3277 (GEL), 2001 WL 669042, at *6 (S.D.N.Y. June 13, 2001).

There is no question that such sweeping agreements to arbitrate disputes are enforceable as to any dispute arising out of an arbitration agreement, including collateral matters.  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004).  As the Second Circuit stated in *JLM supra*:

> [R]ecognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. . . . *Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.*

*Id.* at 172 (emphasis added) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001).

The arbitration clause at issue in this case is sufficiently broad to encompass collateral matters. In fact, the Second Circuit has enforced similar provisions, with sweeping "any" dispute or controversy language. *See, e.g., JLM*, 387 F.3d at 172. ("Any and all differences and disputes of whatsoever nature arising out of this Charter . . ."); *Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info.*, 369 F.3d 645, 649 (2d Cir. 2004) ("[A]ny controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement . . ."); *Vera v. Saks & Co.*, 335 F.3d 109, 117 (2d Cir. 2003) ("Any dispute, claim, grievance or difference arising out of or relating to the Agreement . . ."); *Louis Dreyfus*, 252 F.3d at 225 ("[A]ny dispute arising from the making, performance or termination of this Charter Party . . .") (internal quotations omitted); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) ("[A]ny dispute, controversy or claim arising under or in connection with [agreement] . . .")

The claims asserted in the Complaint in this case are clearly encompassed by the Agreement's expansive arbitration provision in § 9.5 of the Agreement which speaks in terms of "any" dispute or controversy. Thus, Symphony's claims, even if construed as collateral, are captured by this broadly written provision and are indisputably subject to arbitration.

**D.    All of Symphony's Claims Against Defendants Are Arbitrable
Under the Agreement as a Matter Of Law**

The third prong of the arbitrability test merits little discussion since there is no question that the exclusively common law claims set forth in the Complaint are arbitrable, as they involve a dispute about the allocation of the Adjustments between the parties to the agreement who had agreed to arbitrate "any dispute or controversy arising out of or relating" to the Transaction, including "any document . . . delivered pursuant to . . . [or] in connection" with the Agreement.

Knapel Decl., Ex. 2.

## POINT II

## SYMPHONY'S ACTION SHOULD BE DISMISSED OR, IN
THE ALTERNATIVE, STAYED PENDING ARBITRATION

Defendants have established that the arbitration provision in § 9.5 of the Agreement

encompasses all of the claims asserted in the instant action. Thus, this Court should enforce the

arbitration agreement between the parties and order arbitration of Symphony's claims in

accordance with the Agreement. *Byrd*, 470 U.S. at 218 (the FAA "leaves no place for the

exercise of discretion . . ., but instead mandates that . . . courts *shall* direct the parties to proceed

to arbitration on issues as to which an arbitration agreement has been signed") (emphasis in

original).

Where all the claims asserted by a plaintiff are subject to arbitration and none remain to

be resolved by the Court, it is appropriate to, and courts routinely, dismiss the complaint with

leave to reinstate following the completion of the arbitration proceedings, if necessary. *See, e.g.,*

*Raiola v. Union Bank of Switzerland, LLC*, 47 F. Supp. 2d 499, 506 (S.D.N.Y. 1999)

(compelling arbitration and dismissing case without prejudice to its reinstatement if further

proceedings are required following the arbitration); *Rand v. J.C. Bradford & Co.*, No. 98 Civ.

4906 (DLC), 1998 WL 872421, at *4-5 (S.D.N.Y. Dec. 15, 1998) (same).

If the Court is not inclined to dismiss the case, but instead to place it on its suspense

calendar, the action should be stayed pending arbitration. 9 U.S.C. § 3. *See WorldCrisa Corp. v.*

*Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997) ("Under Section 3 of the FAA . . ., a district court

'must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or

issues underlying the district court proceeding.'") (citation omitted).

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court enter an Order: (i) granting their motion to compel arbitration of Symphony's claims; (ii) dismissing or, in the alternative, staying this action pending such arbitration; and (iii) granting such other relief as the Court may deem just and proper.

Dated: New York, New York
      September 18, 2007

            FRANKFURT KURNIT KLEIN & SELZ, P.C.

            By: _____
                Edward H. Rosenthal (ER-8022)
                Elizabeth H. Miller (EM-9404)

            488 Madison Avenue
            New York, New York 10022
            Tel.: 212-980-0120
            Fax: 212-593-9175

            Stephen W. Gruhin (SW-0526)
            GRUHIN & GRUHIN, P.A.
            60 Route 46 East
            Fairfield, New Jersey 07004
            Tel.: 973-227-9300
            Fax: 973-227-3900

            *Attorneys for David S. Knapel and*
            *Textile Impressions, Inc.*