UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
:
SYMPHONY FABRICS CORPORATION,           :
:
                Plaintiff,             :
:      07 Civ. 6606 (GEL)
          -v-                           :
:      **OPINION AND ORDER**
DAVID S. KNAPEL and TEXTILE              :
IMPRESSIONS, INC.,                       :
:
                Defendants.            :
:
-----------------------------------------------------------------x

David B. Newman, Day Pitney LLP, New York, NY,
for Plaintiff.

Edward H. Rosenthal, Elizabeth H. Miller, Frankfurt
Kurnit Klein & Selz, P.C., New York, NY, Stephen
W. Gruhin, Gruhin & Gruhin, P.A., Fairfield, NJ,
for Defendants.

GERARD E. LYNCH, District Judge:

      Plaintiff Symphony Fabrics Corporation ("Symphony") brings this diversity action asserting claims under New York state law against defendants Textile Impressions, Inc. ("Textile") and David S. Knapel for conversion, unjust enrichment, breach of fiduciary duty, fraud, and misrepresentation. Pursuant to an arbitration provision contained in an asset sale and purchase contract among the parties, defendants move to compel arbitration and dismiss the complaint or, in the alternative, to stay proceedings pending arbitration. Symphony opposes the motion, asserting that defendants lack standing to enforce the arbitration provision and that, in any event, its claims fall outside its scope. For the reasons stated below, defendants' motion to dismiss the complaint will be granted.

**BACKGROUND**

**I.     The Asset Sale and Purchase Agreement**

In March 2006, Symphony, Textile, and Textile's sole shareholder, director, and officer, David S. Knapel, entered into an Asset Sale and Purchase Agreement ("Agreement") whereby Symphony agreed to acquire, *inter alia*, the inventory of a Textile-owned business named Pago Fabrics ("Pago"). (See Knapel Decl. Ex. 2; id. ¶ 24.[1]) Both Pago and Symphony are engaged in the purchase and sale of fabrics used in apparel-related industries. (Id. ¶ 17.) Under the Agreement, Pago was to become an operating division of Symphony, and Knapel, who prior to the transaction had overseen all operational and financial aspects of Pago, agreed to continue to run Pago as an employee of Symphony after the sale. (Id. ¶¶ 19, 52, 56.) The Agreement became effective on March 1, 2006 (the "Effective Date"), but the transaction was not fully consummated until late March or early April 2006 (the "Closing"). (Id. ¶ 34.)

Because Pago was an operating business at the time of the transaction, "revenue was going to be coming in as a result of product sales [that] had occurred" both before and after the transaction's Effective Date. (D. Mem. 3.) Under the Agreement, revenues generated prior to the Effective Date were to be retained exclusively by Textile, while revenues from new accounts receivable generated on or after the Effective Date belonged to Symphony. (See id. Ex. 2

---

[1] In deciding the pending motion, the Court assumes that the allegations of the parties demanding arbitration (i.e., the defendants) are true. See Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995) (assuming the truth of defendant's allegations and noting that "in deciding arbitrability, [the] court is to look to allegations of party demanding arbitration and — if they fall within the scope of the parties' agreement — [the] court should compel arbitration, no matter how frivolous allegations appear to be").

§§ 1.6(xi), 4.1(xv).)  Both Textile and Symphony also continued to incur and pay expenses during the "the several month period prior and subsequent to the Effective Date."  (Id. ¶ 6.)

In light of the parties' ongoing commercial activities during the months "straddl[ing]" the transaction, "the revenue received on a post-Effective Date basis from the accounts receivable, as well [as] incurred and/or unreimbursed expenses, would eventually have to be analyzed by and allocated between [Textile] and Symphony."  (Id. ¶¶ 6, 36-37.)  Although the Agreement does not specify precisely how such accounting adjustments would be made, several provisions in the Agreement contemplate a reconciliation process.  For example, Exhibit E to the Agreement, entitled "Assumed Liabilities," references the "post-closing" collection of accounts receivable generated by Pago prior to the Effective Date and Textile's use of those revenues to offset certain liabilities it retained under the Agreement:

> Purchaser [i.e., Symphony] acknowledges its awareness that Seller [i.e., Textile] remains solely responsible for the satisfaction (from both the Purchaser Consideration *and its collection, on a post-closing basis, of all accounts receivable generated by Seller prior to the as of Effective Date)* of [certain] . . . Outstanding Liabilities.

(Knapel Decl. Ex. 2, Ex. E (emphasis added).)  Section § 4.1(xv) of the Agreement similarly contemplates an eventual reconciliation of the parties' revenues and expenses, providing in relevant part:

> [A]ll profits with respect to all accounts receivable generated as and after the Effective Date shall inure to the benefit of and *shall belong exclusively to Purchaser, subject only to Purchaser's continuing obligation to satisfy the . . . Assumed Liabilities.*

(Id. Ex. 2 § 4.1(xv) (emphasis added).)  Both Exhibit E and § 4.1(xv) thus contemplate a "netting" process in which accounts receivable revenues would first be allocated to either Textile

3

or Symphony and then be used to offset each party's incurred and/or unreimbursed expenses. (Id. ¶ 45.)

Despite the need for such a reconciliation process, however, Symphony allegedly failed to implement the proper mechanisms (e.g., bank accounts, credit card system, etc.) to effectuate the necessary post-transaction adjustments until several months after the Closing. (Id. ¶ 69.) As a result, defendants were allegedly forced to employ certain "stop gap" measures in order to maintain the operations of the Pago business, including co-mingling Textile's and Symphony's accounts receivable revenues and using Textile's credit card system and bank accounts. (Id. ¶¶ 62, 67.) Moreover, although Knapel provided periodic reconciliation reports to Symphony in an attempt to resolve the accounting adjustments, Symphony allegedly refused to meet with him despite his repeated requests. (Id. ¶¶ 31, 46.) Knapel subsequently resigned from Symphony "on a forced and coerced basis" in December 2006. (Id. ¶ 53.)

## II.     The Arbitration Provision

The preamble to the Agreement provides that Symphony, Textile, and Knapel are each "referred to as a 'Party' and collectively, as the 'Parties'" throughout the Agreement. (Id. Ex. 2.) Section 9.5 of the Agreement contains a broad arbitration provision governing the "Parties," which provides in its entirety:

> Any dispute or controversy arising out of or relating to this Agreement, any document or instrument delivered pursuant to, in connection with, or simultaneously with this Agreement, or any breach of this Agreement or any such document or instrument shall be settled by arbitration to be held in the State of New Jersey with such proceeding venued in the County of Bergen in accordance with the rules then in effect of the American Arbitration Association or any successor thereto. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision [of] the arbitrator shall be final, conclusive, and binding

> on the Parties. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the Parties irrevocably consent to the jurisdiction of the New Jersey State or Federal courts for this purpose. The losing Party in such arbitration shall pay all the costs and expenses of such arbitration proceeding, and all the reasonable attorneys' fees and expenses of the other Party.

(Id. Ex. 2 § 9.5.)

## II. Procedural History

In July 2007, Symphony filed the instant action in this Court charging defendants with conversion, unjust enrichment, breach of fiduciary duty, fraud, and misrepresentation under New York state law. (Compl. ¶¶ 16-43). Symphony alleges that Knapel embezzled approximately $450,000 from Symphony by collecting "payments on merchandise and repeatedly, intentionally and wrongfully neglect[ing] to remit payments to Symphony and instead deposit[ing] said funds into [Textile's] bank account." (Id. ¶¶ 1, 12.) Defendants have not answered the complaint; instead, they contend that this dispute arises "directly and inextricably . . . from the Agreement" (Knapel Decl. ¶ 7), and thus falls within the broad scope of the arbitration provision. Accordingly, defendants now move to compel arbitration and dismiss the complaint or, in the alternative, to stay proceedings pending arbitration.

## DISCUSSION

## I. The Federal Arbitration Act

Pursuant to the Federal Arbitration Act ("FAA"), an arbitration clause within any "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is no dispute that the arbitration agreement at issue in this case is

5

part of a contract "affecting" interstate commerce, and is thus governed by the FAA.  See Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003).

As evidenced by the FAA's language, "[f]ederal policy strongly favors arbitration as an alternative dispute resolution process." Collins & Aikman Prods. Co. v. Building Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995) (alteration in original).  The Supreme Court has instructed that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983).  Accordingly, "federal policy favoring arbitration requires [courts] to construe arbitration clauses as broadly as possible." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 847 (2d Cir. 1987).  Arbitration should thus be favored "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Mehler v. Terminix Intern. Co. L.P., 205 F.3d 44, 49 (2d Cir. 2000) (internal quotation marks omitted).

## II.    Motion to Stay Proceedings

Section 3 of the FAA authorizes a stay of federal proceedings "where the court is satisfied that the issue before it is arbitrable under the agreement."[2]  Genesco, 815 F.2d at 844;

---

[2] Although § 4 of the FAA allows a court to compel arbitration, "a federal court lacks authority pursuant to 9 U.S.C. § 4 to compel arbitration outside its district." Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc., 269 F. Supp. 2d 356, 363 (S.D.N.Y. 2003); see 9 U.S.C. § 4 ("The hearing and proceedings, under [the parties' arbitration] agreement, shall be within the district in which the petition for an order directing such arbitration is filed."); Provident Bank v. Kabas, 141 F. Supp. 2d 310, 315 (E.D.N.Y. 2001).  The arbitration provision in the Agreement provides for arbitration "to be held in the State of New Jersey with such proceeding venued in the County of Bergen." (Knapel Dec. Ex. 2 § 9.5.)  Although this Court cannot compel arbitration in Bergen County, New Jersey, it is not clear whether the Court could compel arbitration within this district in contravention of the venue provision in the arbitration agreement.  The Second Circuit has not addressed the issue, and several circuits have reached conflicting decisions.  Compare Ansari v. Qwest Commc'ns Corp., 414 F.3d 1214, 1219-20 (10th Cir. 2005) (holding that "'a district court lacks authority to compel arbitration . . . in its own district if another has been specified for

see 9 U.S.C. § 3 (providing for proceedings to be stayed in district courts when an issue is "referable to arbitration"). When asked to stay proceedings pursuant to § 3, a court must address two issues: "first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement." Mehler, 205 F.3d at 47 (internal quotation marks omitted); see Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1063 (2d Cir. 1993). Bearing in mind the FAA's statutory mandate and the federal policy favoring arbitration, the Court turns to this two-step inquiry.

    A.    Existence of Agreement to Arbitrate

"[T]he burden of proving agreement to arbitrate is on the party seeking to resolve the dispute in that forum." Peterson v. Beale, No. 92 Civ. 5412, 1995 WL 479425, at *3 (S.D.N.Y. Aug. 11, 1995). Preliminarily, as noted above, the preamble to the Agreement expressly defines the term "Party" (or collectively, "Parties") as the "Seller" (i.e., Textile), "Knapel," and the "Purchaser" (i.e., Symphony). (Knapel Decl. Ex. 2.) The operative language of the Agreement's arbitration provision repeatedly references the "Party" or "Parties" to the Agreement. See id. Ex. 2 § 9.5 ("The decision [of] the arbitrator shall be final, conclusive, and binding on the

---

arbitration,'" quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer, 49 F.3d 323, 328 (7th Cir. 1995)), with Textile Unlimited, Inc. v. A.BMH & Co., 240 F.3d 781, 783 (9th Cir. 2001) (holding that the FAA "does not require venue in the contractually-designated arbitration locale"), and Continental Grain Co. v. Dant Russell, 118 F.2d 967, 969 (9th Cir. 1941) (holding that district court can compel arbitration in its own district). This Court need not decide whether it can compel arbitration in this district in contravention of the venue provision in the parties' arbitration agreement because none of the parties has requested such relief; to the contrary, defendants specifically seek "arbitration of Symphony's claims *in accordance with the Agreement*." (D. Mem. 17 (emphasis added)). Accordingly, although defendants have moved, *inter alia*, to compel arbitration, only a dismissal or a stay of proceedings pending arbitration is available in this case. See Sea Spray, 269 F. Supp. 2d at 363 ("[When] presented with a petition to compel arbitration outside of the district, the district court should dismiss the petition or, upon motion, stay its proceedings." (internal quotation marks omitted)).

*Parties*. Judgment may be entered on the arbitrator's decision in any court having jurisdiction, and the *Parties* irrevocably consent to the jurisdiction of the New Jersey State or Federal courts for this purpose. The losing *Party* in such arbitration shall pay all the costs and expenses of such arbitration proceeding, and all the reasonable attorneys' fees and expenses of the other *Party*. (emphasis added)). The express terms of the Agreement thus make clear that Symphony, Textile, and Knapel are all parties to the arbitration provision.

Symphony nevertheless asserts that Knapel lacks standing to enforce the arbitration provision because the language beneath Knapel's signature line states that he signed the Agreement "individually and as sole shareholder of Textile Impressions Inc. *(Solely as to Section 4.2)*." (Knapel Decl. Ex. 2 (emphasis added).) According to Symphony, the parenthetical limits Knapel's consent solely to Section 4.2, which deals with representations and warranties made by Textile and makes no reference to arbitration. Defendants, in contrast, apparently contend that the parenthetical simply clarifies that Knapel was reaffirming Textile's representations and warranties "individually" — i.e. "[s]olely" — and not in his capacity as the "sole shareholder of Textile." (D. Reply Mem. 8 n.3.)

Although the meaning of the parenthetical phrase is somewhat cryptic, the Court need not solve this riddle because, even assuming *arguendo* that Knapel signed the Agreement only to the extent of Section 4.2, a non-signatory to an arbitration provision can still enforce that provision against a signatory if the claims at issue are "intertwined" with the agreement containing that provision. Choctaw Generation LP v. American Home Assurance Co., 271 F.3d 403, 406 (2d Cir. 2001), quoting Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d

Cir. 1995).³  In this action, the crux of Symphony's claims centers on the proper allocation of accounts receivable revenues between Symphony and Textile, and the "netting" of those revenues against each party's incurred and/or unreimbursed expenses, during the months immediately prior and subsequent to the transaction.  (Knapel Decl. ¶ 45.)  These claims are thus directly governed by §§ 1.6(xi), 4.1(xv) and Exhibit E of the Agreement.  Specifically, § 1.6(xi) and Exhibit E both specify that all accounts receivable generated prior to the Effective Date are to be retained exclusively by Textile.  (See id. Ex. 2 § 1.6(xi) (defining "Excluded Assets" that were to be retained by Textile after the transaction as including, *inter alia*, "all accounts receivable generated from [Textile's] business prior to the as of Effective Date of this Agreement"); id. Ex. 2 Ex. E.)  Section 4.1(xv), in turn, provides that revenues from new accounts receivable generated on or after the Effective Date belong to Symphony.  (See id. Ex. 2 § 4.1(xv).)  As noted above, moreover, the Agreement specifically contemplates a reconciliation process whereby revenues are offset against expenses to effectuate the necessary post-transaction adjustments.⁴  (See id. ¶ 45.)  Because the terms of the Agreement will dictate the disposition of the disputed funds at the heart of this action, Symphony's claims are inextricably "intertwined"

---

³ Symphony's citations to TNS Holdings Inc. v. MKI Securities Corp., 92 N.Y.2d 335 (1998) and Tanbro Fabrics Corp. v. Deering Milliken, Inc., 318 N.Y.S.2d 764 (1st Dep't 1971) (see P. Mem. 3) are inapposite because those cases involved signatories to arbitration provisions seeking to compel unwilling non-signatories to arbitrate, the reverse of the situation here.

⁴ See Knapel Decl. Ex. 2 § 4.1(xv) (providing that "all profits with respect to all accounts receivable generated as and after the Effective Date shall inure to the benefit of and shall belong exclusively to [Symphony], *subject only to [Symphony's] continuing obligation to satisfy the . . . Assumed Liabilities*" (emphasis added)); id. Ex. 2 Ex. E (providing that Textile "remains solely responsible for the satisfaction (from both the Purchaser Consideration *and its collection, on a post-closing basis, of all accounts receivable generated by Seller prior to the as of Effective Date) of [certain] . . . Outstanding Liabilities*" (emphasis added)).

with the Agreement.  Choctaw, 271 F.3d at 406.  Accordingly, even if Knapel was not a signatory to the arbitration provision, he may nevertheless enforce its terms against Symphony.  See id; Genesco, 815 F.2d at 846 ("[W]hile the [FAA] requires a writing, it does not require that the writing be signed by the parties.").[5]

Symphony also contends that Textile lacks standing to enforce the arbitration provision because "[t]his action is all about Knapel" and there are "no substantive allegations against [Textile]." (Newman Aff. ¶¶ 13, 20-22.)  Counts I and II of the complaint, however, expressly advance claims against both Knapel and Textile for conversion and unjust enrichment.  (See Compl. ¶ 19 ("As a result of the conduct of Knapel *and [Textile]* . . . Symphony has suffered damages . . . ." (emphasis added)); id. ¶¶ 20, 25 ("The actions of Knapel *and [Textile]* were purposeful and contumacious . . . ." (emphasis added); id. ¶ 23 ("Despite Symphony's requests, Knapel *and [Textile]* have failed to provide support showing *they* were entitled to these payments, and Knapel *and [Textile]* have not repaid Symphony . . . ." (emphasis added); id. ¶ 24 ("As a result of the conduct of Knapel *and [Textile]* and *their* failure to repay the funds, Symphony has suffered damages" (emphasis added).)  It is undisputed, moreover, that Textile executed the Agreement as a whole without any qualifications.  (See Knapel Decl. Ex. 2.)

Based on these facts, it is clear that an enforceable agreement to arbitrate binds all of the parties in this case, and that both defendants have standing to enforce its terms.  As a practical matter, moreover, it would be wholly inefficient to allow Textile to arbitrate while forcing

---

[5] Symphony's observation that § 5.3 of the Agreement "specifically exclude[s] [Knapel] as a beneficiary of the Agreement" (Newman Decl. ¶ 26; see P. Mem. 4) does not alter this conclusion because a non-signatory's ability to enforce an arbitration provision against a signatory does not depend on whether the non-signatory is a third-party beneficiary.  See Choctaw, 271 F.3d at 406-08, 411.

Knapel to litigate because the "merits" of such litigation against Knapel would be entirely "bound up with the dispute . . . being arbitrated between [Symphony] and [Textile]." Choctaw, 271 F.3d at 407. Accordingly, defendants have met their burden of proving the existence of an agreement to arbitrate.

      B.      Scope of Arbitration Agreement

Having concluded that a binding agreement to arbitrate exists among the parties, the Court must next determine whether the claims asserted by Symphony fall within the scope of that agreement. See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002) (noting that in the absence of "clear[] and unmistakabl[e] evidence" that the parties intended the arbitrator to resolve questions of arbitrability, "whether an arbitration clause . . . applies to a particular type of controversy is for the court"). The Second Circuit has instructed that:

> In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims "touch matters" covered by the parties' . . . agreements, then those claims must be arbitrated, whatever the legal labels attached to them.

Collins, 58 F.3d at 20-21, quoting Genesco, 815 F.2d at 846.

The arbitration provision at issue in this case "is a classically broad one," Mehler, 205 F.3d at 49, providing for arbitration of "*[a]ny* dispute or controversy *arising out of or relating to* this Agreement" (Knapel Dec. Ex. 2 § 9.5 (emphasis added)). This provision is "precisely the kind of broad arbitration clause that justifies a presumption of arbitrability," Mehler, 205 F.3d at 49 (internal quotation marks omitted), and arbitration is favored "unless it can be said 'with positive assurance' that an arbitration clause is not susceptible to an interpretation that covers the

asserted dispute," Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 35 (2d Cir. 2002), quoting Thomas James Assocs., Inc. v. Jameson, 102 F.3d 60, 65 (2d Cir. 1996).

Despite the broad sweep of the arbitration provision in the Agreement, Symphony contends that its claims fall outside the scope of the provision because the dispute in this case concerns only "the performance of Knapel under his employment by Symphony," and "does not arise from or relate to the Asset Sale and Purchase Agreement." (P. Mem. 6.) As explained above, however, the central dispute in this case involves the proper allocation of accounts receivable revenues between Symphony and Textile, and the reconciliation of those revenues against each party's expenses. See Knapel Decl. ¶ 6 ("It is the reconciliation of these [revenues and expenses] which 'straddle' the several month period prior and subsequent to the Effective Date, and which of the parties is to receive or be charged . . . which is at the heart of this action."). Whether Knapel and Textile defrauded Symphony and converted funds belonging to it, or simply retained receivables due to it under the Agreement, is precisely the kind of question that the Agreement refers to arbitration. Symphony's claims are thus governed directly by §§ 1.6(xi), 4.1(xv), and Exhibit E of the Agreement, which expressly define the parties' legal rights and obligations concerning the disputed funds. See supra at 8-9. As a result, despite Symphony's attempt to characterize this action as an employment dispute, Symphony's allegations unequivocally "aris[e] out of or relat[e] to the Agreement" (id. Ex. 2 § 9.5), and thus clearly "touch matters" within the scope of the Agreement's broad arbitration provision. Collins, 58 F.3d at 21.

In sum, the record evidence convincingly demonstrates that the parties in this action entered into a binding agreement to arbitrate, that both defendants have standing to seek

enforcement of that agreement, and that the claims asserted by Symphony fall within the scope of that agreement. "When all of the issues raised in a litigation lie within the scope of an arbitration agreement, courts have the discretion to dismiss the action rather than issue an order directing a stay." Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc., 269 F. Supp.2d 356, 366 (S.D.N.Y. 2003). Because "no useful purpose exists for directing a stay of this litigation where all of the issues in dispute are subject to arbitration, the Court will dismiss the action rather than issue a stay." Id. Accordingly, defendants' motion to dismiss the complaint will be granted.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint is granted.

SO ORDERED.

Dated: New York, New York
　　　　June 2, 2008

_____
GERARD E. LYNCH
United States District Judge